The Court took time to consider the motion, and at an after day in the term, the following opinion was delivered, by
Parsons, C. J.
The plaintiff has commenced an action of the case, demanding damages of the defendant for an injury to his character, committed by the defendant, in maliciously uttering and publishing defamatory words, which imported that the plaintiff had committed felony by robbing the Nantucket Bank.
[ * 24 ] * To this demand the defendant pleaded not guilty, and also, by leave of the Court, a special plea in bar, justifying the speaking of the words, because, as he alleged, at the time when they were spoken, he and Benjamin Russell were members of the House of Representatives, then in session, and that he spoke the words to Russell, in deliberation in the house, concerning the appointment of a notary public, and that the words had relation to the subject of their deliberation.
Thé plaintiff, in his replication, denies these allegations, and avers that the words were spoken by the defendant of his own wrong, and without such cause as he had alleged, and tenders an issue to the country. The defendant does not demur to the replication, but joins the issue thus tendered.
Both the issues came on to trial, and it appeared from the evilence, that when the words were spoken, the defendant and Russell, were members of the House of Representatives, then in session. The occasion, manner, and circumstances, of speaking them are thus related by Russell, the witness. He, having some acquaintance with the plaintiff, and thinking highly of his integrity, was applied to by him to move a resolution for the appointment of an additional notary for Nantucket, the town represented by the defendant. Russell made the motion, and had leave to lay the resolution on the table The defendant, in his place, inquired where Russell had the information of the facts on which the resolution was moved. The wit *29 ness answered, from a respectable gentleman from Nantucket. The resolution then passed, and the speaker took up some other business. Russell then left his place, and was standing in the passage-way, within the room, conversing with several gentlemen. The defendant, leaving his place, came over to Russell, and asked him who was the respectable; gentleman, from whom he had received the information he had communicated to the house. Russell answered carelessly, he was perhaps one of his relations, and named Coffin, as most of the Nantucket people were of that name. The witness, then, perceiving the plaintiff sitting behind the bar, pointed to him, and informed the defendant he was the man. The defendant looked towards him, and said, “ What, that convict? ” Russell, surprised at the question, asked the * defendant [ * 25 ] what he meant; he replied, “ Don’t thee know the business of Nantucket Bank?” Witness said, “ Yes, but he was honorably acquitted.” The defendant then said, “ That did not make him less guilty, thee knows.” It further appears that this conversation passed a little before one o’clock, that the election of notaries was not then before the house, but was made that afternoon, or the next day, and that the plaintiff was not a candidate for that office. And there is no evidence that the resolution laid on the table by Russell, and passed, or the subject matter of it, was ever after called up in the house.
It does not appear from the report that it was contended by the defendant, that the words testified to did not import the slander charged in the plaintiff's declaration, nor is the verdict objected to on that ground : the judge therefore directed the jury, that if they believed the testimony, the plaintiff had maintained the first issue. But the defendant insisted that the evidence supported the justification contained in the bar, and that by law the second issue ought to be found for him.
The question of law, therefore, arises on the second issue. Both parties had submitted the trial of this issue to a jury. The issue involved both law and fact, and the jury must decide the law and the fact. To enable them to settle the fact, they were to weigh the testimony: that they might truly decide the law, they were entitled to the assistance of the judge. If the judge had declined his aid in a matter of law, yet the jury must have formed their conclusion of law as correctly as they were able. But the judge was officially obliged to declare to the jury his opinion of the law. If this be denied, as a matter not within the jurisdiction of the Court, it must also be denied that the jury were legally authorized to decide on "¿he law; the consequence of which would be, that, when any defendant representative should plead his privilege in bar, whether *30 the plea be true or false cannot be inquired into, because every such plea must involve both law and fact; and the judge must send the parties out of Court.
If the judge was officially obliged to declare the law to the jury, he must necessarily take notice of the law, on which the [ * 26 ] defendant relied, and give it, according to his judgment, * a sound construction, applicable to the issue on trial. The law relied on is the twenty-first article of the declaration of rights.
This article he was obliged to notice and explain, according to what he judged to be its true intent and effect. If there had been any explanation of this article, by the act of any legislature, or by the judgment of any court, constitutionally obligatory on courts of law, such explanation is law, and ought to have governed the judge in his construction of the article. It is not pretended that at the time of the trial any such act or judgment existed. The only aid' which the judge could receive, must have been derived from other parts of the constitution, and from the principles of the common law, by which sound rules of construction are established.
The judge accordingly gave to the jury his construction of the article, and declared to them his opinion, that the facts did not in law maintain the issue for the defendant; and the jury found a verdict for the plaintiff".
To this opinion of the judge the defendant excepted, and moves for a new trial; and on the correctness of it are we now to decide.
As the jury found a verdict agreeably to the judge’s direction, it is to be presumed that they were influenced by it; and if the direction was wrong, the cause ought to be again tried by another jury, uninfluenced by an erroneous opinion of the judge in a matter of law.
The twenty-first article of the declaration of rights declares that “ The freedom of deliberation, speech, and debate, in either house of the legislature, is so essential to the rights of the people, that it cannot be the foundation of any accusation or prosecution, action or complaint, in any other court or place whatsoever.” On this article the defendant relies for his justification. And if it were competent to the judge, on the trial, to declare his opinion of the true intent and meaning of it, it must be competent for this Court to decide whether his opinion was or was not legal; or the defendant can have no relief by his motion ; unless the Court are to decide, without inquiry or authority, that the opinion was against law. But I know of no action within the jurisdiction of a court, and regularly before it, in which it will not be the duty of the [ * 27 ] judges to decide all matters of law arising in it, #so far as the court is competent to decide on them, according to *31 their own apprehension of the law. Otherwise they will have no jurisdiction of legal questions; or they must act as ministerial agents, deciding according to the will of others.
In considering this article, it appears to me that the privilege se cured by it is not so much the privilege of the house, as an organized body, as of each individual member composing it, who is entitled to this privilege, even against the declared will of the house. For he does not hold this privilege at the pleasure of the house, but de rives it. from the will of the people, expressed in the constitution, which is paramount to the will of either or both branches of the legislature. In this respect, the privilege here secured resembles other privileges attached to each member by another part of the constitution, by which he is exempted from arrests on mesne (or original) process, during his going to, returning from, or attending, the Genera] Court. Of these privileges, thus secured to each member, he cannot be deprived, by a resolve of the house or by an act of the legislature.
These privileges are thus secured, not with the intention of protecting the members against prosecutions for their own benefit, but to support the rights of the people, by enabling their representatives to execute the functions of their office without fear of prosecutions, civil or criminal. I therefore think that the article ought not to be construed strictly, but liberally, that the full design of it may be answered. I will not confine it to delivering an opinion, uttering a speech, or haranguing in debate ; but will extend it to the giving of a vote, to the making of a written report, and to every other act resulting from the nature, and in the execution, of the office; and I would define the article as securing to every member exemption from prosecution, for every thing said or done by him, as a representative, in the exercise of the functions of that office, without inquiring whether the exercise was regular according to the rules of the house, or irregular and against their rules. I do not confine the member to his place in the house; and I am satisfied that there are cases in which he is entitled to this privilege, when not within the walls of the representatives’ chamber.
*He cannot be exercising the functions of his office as [*28 ] member of a body, unless the body be in existence. The house must be in session, to enable him to claim this privilege ; and it is in session, notwithstanding occasional adjournments, for short intervals, for the convenience of its members. If a member, therefore, be out of the chamber, sitting in committee, executing the commission of the house, it appears to me that such member is within the reason of the article, and ought to be considered within the privilege. The body of which he is a member, is in session *32 and he, as a member of that body, is in fact discharging the duties of his office. He ought, therefore, to be protected from civil or criminal prosecutions for every thing said or done by him in the exercise of his functions, as a representative, in committee, either in debating, in assenting to, or in draughting a report. Neither can I deny the member his privilege, when executing the duties of his office, in a convention of both houses, although the convention should be holden in the senate chamber.
To this construction of the article it is objected, that a private citizen may have his character basely defamed, without any pecuniary recompense or satisfaction. The truth of the objection is admitted. But he may have other compensation awarded to him by the house, who have power, as a necessary incident, to demand of any of its members a retraction, or apology, of or for any thing he has said, while discharging the duties of his office, either in the house, in committee, or in a convention of the two houses, on pain of expulsion. But if it is allowed that the remedy is inadequate, then a private benefit must submit to the public good. The injury to the reputation of a private citizen is of less importance to the commonwealth, than the free and unreserved exercise of the duties of a rep ■ resentative, unawed by the fear of legal prosecutions.
A more extensive construction of the privileges of the members secured by this article, I cannot give ; because it could not be supported by the language, or (he manifest intent, of the article. When a representative is not acting as a member of the house, ho is not entitled to any privileges above his fellow-citizens; nor are the rights of the people affected if he is placed on the same [ * 29 ] ground, on which his constituents * stand. He is secured the liberty of travelling to the house, of attending his du ties there, of exercising the functions of his office as a member, and of returning home. But so careful were the people in providing that the privileges, which they, for their own benefit, had secured to their representatives, should not unreasonably prejudice the rights of private citizens, that a member may be arrested upon execution in a civil suit, in cases where he could not be lawfully arrested on original or mesne process. And that offences against law may be duly and seasonably punished, this privilege is not extended to arrests on criminal prosecutions, in any case where by law the member may be prosecuted as a criminal.
If this very liberal construction of the twenty-first article be just; if it be warranted by its language ; if it be consonant to its manifest intent and design, — the question before the Court lies in a narrow compass.
Was Coffin, the defendant, in speaking the defamatory words *33 executing the duties of his office ? Or, in other language, was he acting as a representative ? If he was, he is entitled to the privilege he claims; if he was not, but was acting as a private citizen, as a private citizen he must answer.
Upon information given by the plaintiff to Russell, a member, he had moved a resolution providing for the choice of another notary for Nantucket; and on Russell’s stating that his information was from a respectable person from that place, the resolution had passed ; the house had proceeded toother business; and the subject matter of the resolution, or of the information, was not in fact before the house, although it is certain that any member might have moved to rescind the resolution. Russell, his brother member, was in the passage-way, conversing with several gentlemen: the defendant came to him, and inquired the name of Russell’s informant, who, he had declared, was a respectable gentleman from Nantucket. Was this inquiry, thus made, the act of a representative, discharging his duty, or of a private citizen, to gratify his curiosity ? It was the former, say the defendant’s counsel. Whether it was or not, certainly it was innocent. But to pursue the evidence: the defendant was answered : whatever was his motive, he had received the information. *If, [ * 30 ] upon it, he intended again to call up the resolution, he might have done it. But no motion for that purpose was ever made. He then utters to Russell the defamatory words. What part of his legislative duty was he now performing? It is said that he might apprehend that the plaintiff was a candidate for the office of notary, and that his motive might be to dissuade Russell from giving him his vote. But there is no evidence that the defendant supposed the plaintiff to be a candidate, and it is in evidence that the plaintiff was not a candidate. It is also apparent that the defendant believed that Russell was not ignorant of the indictment against the plaintiff, and of his acquittal. I cannot, therefore, assign to the defendant any other motive for his indiscreet language, but to correct Russell for giving to the plaintiff the appellation of a respectable gentleman, and to justify the correction by asserting that an honorable acquittal, by the verdict of a jury, is not evidence of innocence. It is not, therefore, possible for me to presume that the defendant, in using thus publicly the defamatory words, even contemplated that he was in the discharge of any official duty. This inquiry by the defendant, and his replies, might have been made, for all the purposes intended by him, in State Street, or in any other place, as well as in the representatives’ chamber; and it is not easy for me to conceive that any language or conduct of a representative must be considered as official, merely because he chooses the representatives’ chamber for the scene
*34 But it has been urged that the privilege must extend to a representative giving information to a brother member, on any subject before the house ; or which may be expected to come before the house; for the information may be necessary to enable the member informer] to discharge his official duty with ability and propriety. Without remarking the essential distinction between a man’s seeking information on subjects relating to his office, and his actual execution of its functions, and without observing the extreme difficulty of supposing that defamatory words, maliciously uttered, can ever be considered as useful information, I do clearly admit that a representative will certainly be entitled to his privilege in all [ *31 J cases, where he shall give information in the discharge *of his official duty; although the manner may be irregular, and against the rules of the house. But when a representative pleads his privilege, to entitle himself to it, it must appear that some language or conduct of his, in the character of a representative, is the foundation of the prosecution, for in no other character can he claim the privilege.
But in actions for defamatory words against a member, he may, in cases to which his privilege does not extend, defend himself like any other citizen, by proving that the words were spoken for a justifiable purpose, not maliciously, nor with a design to defame the character of any man. And this defence will avail every man charged with slander, although it may be that the words uttered are not true. I do not, therefore, consider any citizen, who is a repre sentative, answerable in a prosecution for defamation, where the words charged were uttered in the execution of his official duty, although they were spoken maliciously; or where they were not uttered in the execution of his official duty, if they were not spoken maliciously, with an intent to defame the character of any person. And I do consider a representative holden to answer for defamatory words, spoken maliciously, and not in discharging the functions of his office. But to consider every malicious slander, uttered by a citizen, who is a representative, as within his privilege, because it was uttered in the walls of the representatives’ chamber to another member, but not uttered in executing his official duty, would be to extend the privilege farther than was intended by the people, or than is consistent with sound policy, and would render the representatives’ chamber a sanctuary for calumny — an effect which never has been, and, I confidently trust, never will be, endured by any House of Representatives of Massachusetts.
It has been said that, although the judge at the trial had no other information of the nature and extent of the defendant’s privileges but what he derived from the constitution, yet that, since the trial *35 on the first of March instant, the house passed a resolution declaratory of the privileges of its members, to which declaration we are obliged to conform in our judgments; because the house is to judge exclusively of its own privileges.
* That the house is to judge exclusively of its privileges, [ * 32 ] for certain intents and purposes, is very certain; but if it is to exclude courts of law from judging of the privileges of its members in every case, the consequences would be unfortunate to the members. If a member, in any action, pleads his privilege, he submits it to the judgment of the court ; and if it be allowed, it is by virtue of the judgment of the court. All, therefore, which the court could do, upon such an hypothesis, would be to reject the plea, lest, in judging of it, it should invade the privileges of the house.
The resolution declares that words spoken by any member, within the walls of the house, relative to any subject under their consideration, either in their separate capacity, or in a convention of both branches of the legislature, whether the member speaking such words addresses himself in debate to the chair, or deliberates or advises with another member respecting such subject, are alone and exclusively cognizable by the house ; and that for any other tribunal to take cognizance of words thus spoken would be a violation of the twenty-first article of the constitution. And the words relied on for the defendant are, “ whether the member speaking such words addresses himself to the chair, or deliberates or advises with another member respecting such subject.”
As it is admitted by the defendant’s counsel that this Court is competent to construe the twenty-first article, in order to decide whether the facts in the case bring the defendant within it, so also it is admitted that the Court is competent to construe this resolution for the same purpose. The resolution, judging from the face of it, does not appear to be an act of the house in any case of contempt on trial before it, but to be a general declaration of the privileges secured to the members by the twenty-first article of the constitution ; because it is declared that an invasion of these privileges would be a violation of that article. I consider the house, therefore, as defining the constitutional privileges of its members, relating to words spoken by them. In this declaration, the words must be spoken on a subject before the house, and either addressed to the chair, or by one member to another by way of deliberation and advice on the same subject. * In either case, the [ * 33 ] words must be spoken officially, although in the latter ease they may be spoken in a disorderly and irregular manner. The house has not, therefore, claimed any privileges for its members, *36 when prosecuted for slander, unless the words charged were spoken officially in the character of a representative. This inference is inevitable, unless it should be unreasonably concluded that one member could deliberate or advise with another member, on a subject before the house, having abandoned his official duty, and acting as a private citizen. Whether I do or do not allow to the resolution, thus passed, the force of law, I am satisfied that it claims no privileges, but what are secured to the members by the constitution, of which, as far as it extends, it is in affirmance. The resolution does not, therefore, in my opinion, aid the defendant; for it appears, from the facts in the case, that the defamatory words, charged on the defendant, were not spoken by him on a subject before the house, either in an address to the chair, or by way of deliberation or advice with another member.
It has been urged that a declaration of privileges made by the house, whether those privileges do or do not belong to it, has the force of law, and is obligatory, in all cases, on the courts of justice. A declaration of that nature is not now before us; for I am satisfied that the house has all the privileges claimed by its resolution. Whenever a declaration shall be made by the house, claiming privileges not belonging to it' in the opinion of the judges of a court of law, let the judges then decide the question. The merits of it must depend on a careful consideration of the constitution, with a due regard to the privileges and prerogatives of the house resulting from it. On this subject I give no opinion ; but from the observations I have already made, it may not be improper to declare, that if it had appeared to me that the words charged on the defendant had been officially spoken by him without the walls of the representatives’ chamber, either in a convention of the two houses holden in the senate chamber, or in a committee, while executing the commission of the house then in session, as I am now advised, I would have allowed him his privilege, although, by the [ * 34 ] resolution * produced, the house seem to confine its privileges to words spoken within the walls of the representatives’ chamber.
But the danger of conflicting jurisdictions has been insisted on with much ability and eloquence, if we should support the present action. I am sensible that where a conflict of final jurisdictions exists in any state, there must be a defect in the laws of that state. In my opinion, this state is not liable to the opprobrium ; for I do not conceive that final conflicting jurisdictions here are consistent either with our constitution or statutes.
To introduce examples from the British House of Commons cannot much illustrate the subject. The privileges of that house are *37 not derived from any written constitution, but have been acquired by the successful struggles of centuries, directed either against the monarchy or an hereditary aristocracy. The exertions of the commons have generally been popular, because the people were supposed to reap the fruits of them. In this state, we have a written constitution, formed by the people, in which they have defined, not only the powers, but the privileges, of the house, either by express words, or by necessary implication. A struggle for privileges, in this state, would be a contest against the people, to wrest from them what they have not chosen to grant. And it may be added that the grant of privileges is a restraint on the rights of private citizens, which cannot be further restrained but by some constitutional law. These principles are perfectly consistent with the resolution of the house, which is not a claim of any further privileges not granted by the constitution, but a description of some, and only of some, privileges there granted.
I consider the House of Representatives not only as an integral branch of the legislature, and as an essential part of the two houses in convention, but also as a court having final and exclusive cognizance of all matters within its jurisdiction, for the purposes for which it was vested with jurisdiction. It has jurisdiction of the election of its members; of the choice of its officers; of its rules of proceeding; and of all contempts against the house, either in its presence, or by violating the constitutional privileges of its members. When the house is proceeding as a court, it has, exclusively, * authority to decide whether the matter before it be or [ * 35 ] be not within its jurisdiction, without the legal control of any other court. As to contempts, the house proceeds against the offender to punish the contempt. Courts of law proceed to punish offences against the state, and to redress private wrongs. The same act may be a contempt against the house, an offence against the state, and an injury to an individual; and in all these respects, proceedings may be had against the offender.
When the house decides in a question of election, it can conclusively decide on the right of voting claimed by any elector, so far as is necessary to settle the election. But an elector illegally deprived of his right of voting, may demand redress for this wrong against the selectmen by a suit at law. This was decided in the cases of Gardiner and of Kilham against the Selectmen of Salem, (6) where the only defence set up was, that the plaintiffs had no right to vote. Upon this question, the judgments of both courts, however rendered, could be executed without any interference. Let *38 me illustrate the subject by supposing a case or two. A member is assaulted in the town in which the house is in session, and is cruelly beaten, for words spoken in the house in the execution of his duty. The house may proceed against the assailant for a contempt; and cannot the member prosecute him at law for damages? And may not the grand jury indict him for a breach of the peace ? And neither can the proceedings of a court of law control the proceedings of the house, nor can the proceedings of the house control the courts of law. The judgments of each court, whatever may be the result, can be executed without any interference. Suppose a public officer indicted for extortion, and upon trial acquitted at law; cannot he afterwards be convicted by the senate on an impeachment? Both judgments may be executed without interference. The courts of law proceed to punish the offender, and he is acquitted. The power of the senate is censorial, and exercised to preserve purity in office. If it should be supposed that the senate cannot proceed after an acquittal at law, it should be remembered that, by the express provision of the constitution, courts of law may proceed after a conviction in senate; [*36] and *in the proceedings at law the jury may acquit; and it could not have been intended to place the senate as subordinate to a court of law. The true design of that provision was a mere cautionary declaration that the proceedings in the senate were not to punish offenders against the state, but for a different end. And I would add that, in the present case, if the house, of which the defendant was a member, had proceeded against the plaintiff for a contempt in suing this action,—whatever had been the result of its proceedings, this Court could not have interfered, or granted any relief, until the sentence had been performed. And as this judgment could not have affected those proceedings, so nei ther could those proceedings have controlled the authority of this Court. The two courts are independent, and have each exclusive cognizance of the matters within its jurisdiction; and although the transaction animadverted on may be the same, yet the proceedings are for different purposes, and the judgments of both courts may be executed without any interference. There cannot, therefore, be any conflict of jurisdictions.
Extreme cases of the abuse of power, either in the House of Representatives, or in this Court, may be imagined; but they are not to be argued from, to influence legal decisions.
Since the argument of this cause, I have examined the subject with as much attention as I have been able to give to it, amidst all the business of the Court pressing on us, with a strong disposition to guard the privileges of the house, and of its members, because *39 their privileges are essential to the rights of the people, and ought to be supported, by every good citizen, according to their true limits.
From this examination I am satisfied that, whatever may be our decision of the question, it is within our jurisdiction thus brought before us; and that no breach of the privileges of the house, or a conflict with its jurisdiction, can result from our determination.
I am convinced, after much consideration, that the facts presented by the case do not entitle the defendant to the privilege which he claims; and that, for this cause, the verdict ought not to be set aside.
* Under this impression, to give a different opinion [ * 37 ] would be a desertion of a solemn duty, and a gross prevarication with my own conscience.
In this opinion of the Chief Justice, the other judges, viz., Sedgwick, Sewall, Thatcher, and Parker, severally declared their full ind entire concurrence.
The motion for a new trial, on the ground that the jury had given < xcessive damages, was afterwards argued by the same counsel.
Dexter observed that the true principle which must govern in every case of this kind was, that the damages ought to be in exact proportion to the injury sustained. In actions for a breach of contract, or for a tort committed on property, it is easy to apply this principle; but in actions fora mere personal tort, the great difficulty was to form a precise estimate of the injury received. It must be greater or less according to the character and circumstances of the parties, the manner of the act or words complained of, the degree of malice shown by the wrong-doer, the amount of the suffering of the other party, and very many other circumstances, which it is not necessary to recite.
In the case now before the Court, no circumstances appear which should occasion the award of very extravagant damages. There was no evidence that either of the parties was possessed of very great wealth. The only witness sworn at the trial testified that the plaintiff was a very respectable man. There is no disposition on the part of the counsel for the defendant to derogate from that character. The plaintiff is, however, but a private citizen; so he has not lost any office of rank or profit, nor been put in hazard of losing such an office. The defendant is the representative of his town in the legislature of the commonwealth. This is the amount of what appears respecting the character and circumstances of the parties.
*40 If the words charged had been publicly spoken and addressed to the house, the damage to the plaintiff' would have been greater in proportion to the number of the persons who should hear them ; and it may be added that the defendant’s official standing, [ * 38 ] as a member of the house, would * have given weight, as well as credit and currency, to the slander. Yet in such a case, it is agreed that the plaintiff could have obtained no pecuniary satisfaction whatever for the injury he might have sustained.
The sole ground on which an action of slander for charging the party with a crime can be maintained, though no actual damage be sustained, is that the law presumes damage from the danger that may arise of being prosecuted for the offence: the present case is one in which the general principle would not entitle the plaintiff to any damages; for he cannot be put in danger of a prosecution after an acquittal.
From the fact of the acquittal, it may likewise be strongly argued that the real damage to the plaintiff must be very inconsiderable ; inasmuch as he had it in his power, at any time, to prove his inno cence, by the record of his trial, which he might always have in his pocket, or publish to the world, if he saw fit.†
From these considerations, the damages assessed by the jury appear enormous and excessive, and it is believed that no case can be shown where so high a sum was given without the allegation or proof of any actual or special damage whatever.
Whitman, in support of the verdict, said that the conclusions he should draw from his brother Dexter’s premises were widely different from those he had suggested.
If these words had been spoken in debate, they might have been attributed to the warmth, and even intemperance, not unfrequently exhibited in public discussions. In such case, malice would be less presumable in the speaker, and the impression on the minds of the hearers would be less forcible and permanent. By uttering the slander in the artful manner which the case exhibits, the defendant not only showed more malice than by an open charge [ * 39 ] unguardedly made in * an animated contest, but the mischief and damage to the subject of the slander were also greatly enhanced.
The counsel for the defendant has said that the plaintiff’sacquit *41 tal vtas notorious, and if it was not, he might publish it, and by this means prevent any injurious impression on the public mind from the words spoken. That acquittal has been published, and it ought to have been a shield to the plaintiff, and have protected him against such malignant insinuations. If a judicial declaration of innocence is not sufficient to protect that innocence from an imputation of guilt, an acquittal in a court of law, after a full discussion, will lose much of tne value which has been attached to it.
In the case of Bartlett vs. Willis, in Cumberland, which was for a libel, the jury gave 1500 dollars’ damage. The defendant there pleaded the truth of the words in justification ; and although such a justification, if it wholly fail in the proof, may be considered rather as an aggravation of the injury, yet it often happens, and therefore may well be presumed to have happened in that case, that the defendant, in support of his justification, approaches very near to the legal evidence of the truth of his plea, which, though not sufficient to give him a verdict, would naturally and properly have an influence with the jury in lessening the damages.
In the case at bar, the direction of the judge to the jury as to the damages was exceptionable: he declared it to be a subject entirely and exclusively within their province, and he would say nothing which might have a tendency to influence their verdict, except to lay down a general rule in cases of this kind, that the degree of malice was the proper measure of the damages. The law and the fact united were left to the decision of the jury; and the Court will respect the rights of juries as well as their own. They will not lightly set aside a verdict given upon full evidence and solemn argument, where no surprise or corruption is suggested.
The parties in this action, their characters and circumstances, were well known to the jury, who, in contemplation of law, are their neighbors. If they have estimated those characters and circum stances, and considered the degree of malice shown in the case, is it for the Court to say they * have overvalued the [ * 40 ] plaintiff’s character, or judged wrongly of the malice exhibited ? It was not improper for the jury to consider the very great expense the plaintiff had been put to in the prosecution of this action, to which he was impelled by every sentiment of honor. And although the maintenance of a fair and irreproachable character among his fellow-citizens was his sole motive in instituting the suit, yet a pecuniary satisfaction is all that by our law he can obtain, and upon the amount of this will his character in no small degree depend.
The true principle, in cases of this sort was laid down by Lord *42 Mansfield, in the case of Gilbert vs. Burtenshaw. (7) That was, .ike the present, a motion to set aside a verdict, and grant a new trial, on the ground of excessive damages in an action for a malicious prosecution for perjury, and for slander. Lord Mansfield says he should be sorry to say, that in cases of personal torts, no new trials should ever be granted for damages which manifestly show the jury to have been actuated by passion, partiality, or prejudice. But it is not to be done without very strong grounds indeed ; nor unless it appears that the damages are flagrantly outrageous and extravagant.
The Attorney-General, Bidwell, in reply, thought that the circumstances, under which the words in this case were spoken, indicated a much less degree of malice in the defendant, than if they had been spoken in public debate. They were not even addressed to an enemy of the plaintiff, who might have derived a malicious satisfaction in propagating the slander: the communication was made to the plaintiff’s friend, who had, without doubt, been acquainted with all the circumstances of the indictment and trial, which the defendant is supposed to have had in his mind when he spoke the words; to one who, the defendant had every reason to believe, would have no disposition to give currency to the insinuation. The case shows no repetition of the slander, from which a resolution to persist in it, beyond the mere occasion of uttering it, might be inferred.
The case of Bartlett vs. Willis was for eighteen or twenty libellous publications concerning the plaintiff, in a news-L * 41 ] paper, * edited by the defendant. Some of them charged Mr. Bartlett with gross misconduct in his office, as a senator of the commonwealth. Neither in the circumstances of the case, nor in the character of the parties, therefore, can any inference be drawn from that case in support of the present verdict. It is well known too, notwithstanding the circumstances of aggravation n that action, that the amount of the damages awarded was a matter of extreme surprise, wherever it was known.
It is very true that, in presumption of law, the jurors are summoned from among the neighbors of the parties. But if any stress is laid on this point in the present argument, the Court will take notice, that when this cause was submitted, at the court below, to a jury, who were in fact all inhabitants of Nantuclcet, and the real neighbors of the parties, to whom not only their characters and situation were perfectly known, but all the circumstances of the transaction, which were alluded to by the defendant, were familiar, the plaintiff lecovered but fifteen dollars for this very injury and upon *43 the same evidence upon which a jury of this county have awarded the enormous sum of two thousand five hundred dollars.
Some days after this last argument, the following opinion of the Court was delivered by
Parsons, C. J.
The Court having given their opinion that the verdict ought not to be set aside for the misdirection of the judge, the defendant now moves for a new trial, because the damages found by the jury are excessive.
That a verdict may be set aside for excessive damages, there can be no doubt; and it may be done in two cases: one case is where the law recognizes some fixed rules and principles in measuring the damages, whence it may be known that there is an error in the verdict. In this case are included actions on contracts, or for torts done to property, the value of which may be ascertained by evidence. The other case includes actions for personal injuries, where no rules are prescribed by law for ascertaining the damages, but from the exorbitancy of them the Court must conclude that the jury acted from passion, partiality, or corruption — causes which naturally produce error or injustice. But to enable the Court to draw this conclusion, it is not enough, that in * their opinion [ *42 ] the damages are too high, or that much less damages would have been a sufficient satisfaction to the plaintiff; for the lawr has not intrusted the Court with a discretion to estimate the damages, but has devolved the power on a jury, as a matter of sentiment and feeling, to be exercised by them according to their sound discretion, duly weighing all the circumstances of the case, and considering the state, degree, quality, trade, or profession, as well of the party injured, as of him who did the injury. Judges, therefore, should be very cautious how they overthrow verdicts, given by twelve men on their oaths, on the ground of excessive damages.
But as excessive damages may be a good cause for setting aside a verdict in an action for a personal injury, it may be proper to consider when damages are, for this purpose, to be adjudged by the court to be excessive. In Wilford vs. Berkley, (8) the principle stated is, that the magnitude of the damages must be such that the court can manifestly see that the jury have been outrageous in giving such damages as greatly exceeded the injury. A verdict must be set aside for excessive damages, if they are such as are unreasonable and outrageous, and which all mankind might at first blush see to be unreasonable. (9) And it must be a glaring case, indeed, of outrageous damages in a tort, and which all mankind at first blush must think so, to induce the court to grant a new trial for excessive damages. (10) *44 In the case of Boardman vs. Carrington & Al., (11) it is observed by the court, that there is great difference between cases where damages may be seen, as in promises or trespass for goods, and where the damages are matters of opinion and speculation, and are ideal; that the judges are to advise, and not to control juries ; and when a verdict is set aside for excessive damages, it must be in a case where the damages are monstrous and enormous indeed, and such as all mankind will be ready to exclaim against at first blush. It is admitted in the case of Gilbert vs. Burtenshaw, which was cited at the bar, that verdicts may be set aside for excessive [ * 43 ] damages, when * their magnitude manifestly shows the jury to have been actuated by passion, partiality, or prejudice. But it is observed that it is by no means to be done because the court may feel, that if they had been on the jury, they would have given less damages, or because they may think that the jury would have discharged their duty by giving a less sum ; and that of all the cases delivered to a jury, none is more emphatically left to their sound discretion than an action of slander ; and unless it appears that the damages are flagrantly outrageous and extravagant, it is difficult for the court to draw a line.
The result of these cases seems clearly to settle the principles which are to govern the court in setting aside a verdict for excessive damages in an action for a personal injury. When the damages are so great, that it may be reasonably presumed that the jury, in assessing them, did not exercise a ,sound discretion, but were influenced by passion, partiality, prejudice, or corruption, the court may set aside the verdict, and send the cause to another jury for revision.
Let us now consider the evidence, so far as it can be collected from the record and the judge’s report.
The words uttered imported a charge of a heinous crime, a felonious robbery of the Nantucket Bank. They were not spoken privately, but in the chamber of the House of Representatives, and .n the hearing of some people there, for Bussell was interrupted by the defendant, when conversing with • several gentlemen. The defendant was in a respectable and honorable station, representing in the legislature the town of Nantucket. And there is no evidence of the condition, circumstances, or profession, of the plaintiff.
The defendant’s counsel have argued that the damages are excessive, on three grounds — That it appears from the record, that the jury, at the Common Pleas in Nantucket, assessed the damages at fifteen dollars only; that the defendant did not wantonly seek *45 occasion for uttering the slander, but that it was offered by the language the witness had used on a subject recently under the consideration of the house ; and that it appears that the plaintiff, having been acquitted of the crime imputed to him, was not in danger of being prosecuted criminally in consequence of the defa motion.
* The first argument cannot have any weight, because [ * 44 j we have no knowledge of the evidence offered to the former jury, and can, therefore, form no opinion of the impression, which the injury, the plaintiff complained of, ought to have made on their minds. And if we could presume that they had the same evidence that was given to the last jury, yet it is an established rule of law, that the jury on the appeal are obliged to try the cause uninfluenced by any former verdict.
The circumstance relied on in the second argument does not appear to us to have much, if any, tendency to mitigate the damages, Russell had declared that his information was from a respectable gentleman—an epithet, when applied to the plaintiff, the defendant did not brook, but retorted the charge of felony.
The last circumstance relied on by the defendant’s counsel certainly had a tendency, in one view of the subject, to mitigate the damages, for the reason assigned in the argument. But upon a consideration of all the circumstances, it is our opinion that its tendency was, upon the whole, to aggravate the damages. The plaintiff, having been accused of felony, had submitted his cause to his country, and a jury had acquitted him. This was all he could do in his own justification. If he is not now to be considered as an innocent man, he has no other remedy, no other hope. This public declaration of his innocence before a competent and impartial tribunal he has a right to consider not only as a defence against punishment, but as a shield against calumny. But the defendant, as far as in him lay, would disarm him of his defence, and expose him, helpless and unprotected, to obloquy and disgrace. He cannot have another trial for the offence, and when he seeks, in a civil action, a compensation for the injury, he ought to receive a liberal and exemplary satisfaction.
There is no objection to the direction of the judge to the jury on the subject of damages; and there is no evidence that they had been tampered with, or were connected with either party, or were influenced by any bias or prejudice to either side.’ The cause was left to them, under all the circumstances either party thought fit to lay before them; and they found a verdict for the plaintiff, assessing his damages at twenty-five hundred dollars.
* Before we can set aside this verdict, on account of [* 45 ] *46 these damages, we must infer from their magnitude, under all the circumstances of this case, that the jury acted intemperately, or were influenced by passion, prejudice, or partiality. To make this inference, we must have satisfactory evidence that the damages are excessive; (12) and in our opinion this evidence is not before us. The verdict, therefore, cannot be set aside.
Were we impressed with a belief that the damages were too great, and that a less sum would have been an adequate compensation to the plaintiff, yet whether our impression or the impression of the jury is the most correct, as judges, we are not authorized to determine. The plaintiff’s counsel has intimated that he did not wish for larger damages than the Court should think reasonable, as the object of his client in the prosecution was to obtain justice for his character, and not to dispose of it for money. It is not the province of the Court to advise either party; but as the jury have done ample justice to the plaintiff’s character, we are satisfied that a liberal remission of a part of the damages could not in any man ner operate to the plaintiff’s dishonor.
Unless there be a remission of part of the damages, judgment must be entered according to the verdict. (a)

 Vide 2 Mass. Rep. 236, 244.

 Mr. Dexter observed, in the course of his argument upon this question, that he was of counsel for the prosecution, upon the indictment against the present plaintiff to which the words spoken alluded ; and he said that he was himself perfectly satisfied of the correctness of the verdict of acquittal, there having been, in his opinion, very little evidence, to throw a suspicion of guilt upon the object of the prosecution. And this Mr. Dneter believed to be the unanimous sentiment of all fair and discerning men, who heard the trial.

 Cowper, 230

 1 Burr. 609.

 Leeman vs. Allen & Al., 2 Wils. 160.

 Huckle vs. Money, 2 Wils. 205.

 2 Wils. 244.

 2 Wils. 248.

 [Clark vs. Binney, 2 Pick. 113. — Bodwell vs. Osgood, 3 Pick. 379. — Shute vs. Barrett, 7 Pick. 82. — Lord Townsend vs. Hughes, 2 Mod. 150. — Duke of York vs. Pilkington, 2 Show. 246. — Tillotson vs. Cheetham, 2 Johns. 63.— Coleman vs. Southwick, 9 Johns. 45. — 5 Cow. 119. — Southwick vs. Stevens, 10 Johns. 443. — Root vs. King, 7 Cow. 613. — Cole vs. Perry, 8 Cow. 214. — Douglass vs. Tinney, 2 Wend. 352. Ryckman vs. Parkins, 9 Wend. 470.—Rundell vs. Butler, 10 Wend. 119. — Neal vs Lewis, 2 Bay. 204. — Davis vs. Davis, 2 N. & McCord, 81. — Graham's N. T. 410— 442. — Ed.]