**METHODIST FEDERATION FOR SO-CIAL ACTION, an unincorporated association, Plaintiff,**

v.

**James O. EASTLAND et al., Defendants.**

**Civ. A. No. 1845-56.**

United States District Court
District of Columbia.

May 25, 1956.

Leonard B. Boudin, New York City, and Harry I. Rand, Washington, D. C., for plaintiff.

George Cochran Doub, Asst. Atty. Gen., Oliver Gasch, U. S. Atty., Edward H. Hickey and Howard E. Shapiro, Attorneys, Department of Justice, for defendants Raymond Blattenberger, Public Printer, and Carper W. Buckley, Superintendent of Documents.

No appearance filed for defendants Eastland, Johnston, McClellan, Hennings, Daniel, Jenner, Watkins, Welker and Butler, members of Subcommittee to Investigate Administration of Internal Security Act and other Internal Security Laws of the Committee on the Judiciary of the United States Senate.

Before EDGERTON and PRETTYMAN, Circuit Judges, and WILKIN, District Judge.

EDGERTON, Circuit Judge.

A 100-page pamphlet entitled "The Communist Party of the United States—What It Is—How It Works—A Handbook For Americans", issued by the Subcommittee on Internal Security of the Senate Committee on the Judiciary, was printed December 21, 1955. A Concurrent Resolution, passed by the Senate January 16, 1956 and by the House of Representatives April 23, 1956, orders this pamphlet "printed as a Senate Document. * * * There shall be printed seventy-five thousand additional copies of such Senate Document for the use of the Subcommittee on Internal Security of the Senate Committee on the Judiciary." S.Con.Res. 62 [Report No. 2025], 84th Cong., 2d Sess., 102 Cong.Rec. 441, 6069.

The pamphlet contains these statements: "With an eye to religious groups, the Communists have formed religious fronts such as the Methodist Federation for Social Action * * *. Sometimes

fronts will merge to avoid exposure or prosecution. At times they have been known to assume a name similar to some well-known and respectable organization. An example is the Methodist Federation for Social Action which has no official connection with the Methodist Church. * * *" Pp. 91, 95.

The Methodist Federation for Social Action filed a complaint in the District Court against the members of the Senate Subcommittee, the Public Printer, and the Superintendent of Documents. The complaint says the charge that the plaintiff is a Communist front is false as well as defamatory, was made without a hearing, and causes irreparable injury. It says the Concurrent Resolution abridges the plaintiff's rights of free speech, assembly, press and religion, deprives the plaintiff of liberty and property without due process of law, and is a bill of attainder. It asks a declaration that the Concurrent Resolution is unconstitutional, an order enjoining the defendants from printing and distributing the Senate Document, and a temporary restraining order.

■ On May 3, 1956 Judge Wilkin in the District Court issued a temporary restraining order against the Public Printer and the Superintendent of Documents. He also asked for the appointment of this three-judge District Court in accordance with 28 U.S.C. § 2282, 62 Stat. 968. In his view, which we have adopted, the restraining order expired when this court convened.

■ The Public Printer and the Superintendent of Documents have answered the complaint, and have also filed a motion to dismiss or in the alternative for summary judgment. No appearance has been entered on behalf of the members of the Senate Subcommittee. Whatever the facts may be, for the purpose of deciding whether the complaint should ·be dismissed we must assume that its factual assertions are true.

By express provision of the Constitution, members of Congress, "for any Speech or Debate in either House * * * shall not be questioned in any other Place." Art. I, § 6. It would be paradoxical if members could be questioned in any other place for statements in a document which both houses have ordered published.

■ Nothing in the Constitution authorizes anyone to prevent the President of the United States from publishing any statement. This is equally true whether the statement is correct or not, whether it is defamatory or not, and whether it is or is not made after a fair hearing. Similarly, nothing in the Constitution authorizes anyone to prevent the Supreme Court from publishing any statement. We think it equally clear that nothing authorizes anyone to prevent Congress from publishing any statement.

No previous case has been called to our attention in which it has even been attempted to prevent publication of anything Congress has ordered published. In Hearst v. Black, 66 App.D.C. 313, 87 F.2d 68, the plaintiff sought among other things to enjoin the members of a Senate Committee from publishing telegrams alleged to have been obtained in violation of his constitutional rights. The United States Court of Appeals for the District of Columbia said in denying relief: "If a court could say to the Congress that it could use or could not use information in its possession, the independence of the Legislature would be destroyed and the constitutional separation of the powers of government invaded." 66 App.D.C. at pages 316–317, 87 F.2d at pages 71–72. Since Congress has ordered publication of the Senate Document involved in this case, and had not ordered publication of the telegrams involved in the Hearst case, it is even plainer here than there that a judgment for the plaintiff would invade the constitutional separation of powers.

The premise that courts may refuse to enforce legislation they think unconstitutional does not support the conclusion that they may censor congressional language they think libelous. We have no more authority to prevent Congress, or a committee or public officer acting at the

express direction of Congress, from publishing a document than to prevent them from publishing the Congressional Record. If it unfortunately happens that a document which Congress has ordered published contains statements that are erroneous and defamatory, and are made without allowing the persons affected an opportunity to be heard, this adds nothing to our authority. Only Congress can deal with such a problem.

The constitutional history called to our attention includes no instance in which an English court has attempted to restrain Parliament, or an American court to restrain Congress, from publishing any statement. This history therefore tends to confirm our view.

In Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817, neither the President nor Congress had directed the Attorney General to take the particular action which the Court restrained him from taking; and the action restrained was an adverse ruling that had legal consequences, not a mere defamatory publication.

We need not consider whether an injunction would violate the First Amendment as well as the prerogative of Congress.

■ As to the members of the Senate Subcommittee, the complaint is dismissed for lack of jurisdiction. Cf. Hearst v. Black, supra. As to the Public Printer and the Superintendent of Documents, the complaint is dismissed for failure to state a claim on which relief can be granted.

Complaint dismissed.

WILKIN, District Judge (dissenting).

I cannot concur in the majority opinion or the order dismissing the complaint because I do not believe that it is the law "that nothing authorizes anyone to prevent Congress from publishing any statement"—"whether the statement is correct or not, whether it is defamatory or not, and whether it is or is not made after a fair hearing." The effect of the majority decision is to extend legislative privilege "for any Speech or Debate in either House" to complete immunity for anything published in accordance with a Concurrent Resolution of Congress. Such an interpretation of the law is contrary to the history and spirit of our institutions and the pronouncements of our courts and respected legal authorities.

The complaint seeks an injunction against the publication of a libelous statement. The preliminary restraining order was directed against the defendant Blattenberger, as Public Printer, and the defendant Buckley, as Superintendent of Documents, restraining them "from printing or distributing a publication known as 'A Handbook for Americans' while such publication charges that plaintiff is a Communist Front," etc. The complaint and the temporary restraining order did not question the power of Congress to publish reports of legislative action or general information. The complaint questioned the power of officers of government to publish a libel in contravention of the plaintiff's constitutional guarantees.

The defendants filed a motion for dismissal of the complaint or for summary judgment on two grounds:

1. That the publication is within the privilege and immunity granted by the Constitution, Art. 1, § 6, Cl. 1, to Members of Congress; and

2. That courts of law have no power to restrain any publication, even though slanderous, if authorized by Resolution of Congress.

The first ground of the motion requires consideration of the history, theory, and language of the Constitution, regarding legislative privilege. Such a three-fold inquiry leads to the conclusion that legislative privilege should be limited to freedom of Congressmen from arrest and freedom of speech within the legislative houses. Our Constitution says that Senators and Representatives

"shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their

respective Houses, and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place." Const. Art. 1, § 6, Cl. 1.

### History

That is an accurate expression and limitation of the privilege as it was understood at that time. That conception, however, was the result of four hundred years of political and legal strife and evolution. The history of English Parliamentary privilege[1] reveals clearly that the claim of privilege originated in the struggle between Parliament and the Crown. The King asserted his absolute prerogative and Parliament asserted its immunity. When members of Parliament spoke in favor of matters which the King deemed derogatory of his prerogative, he ordered their arrest and trial before his Crown courts. Worthy members of Parliament were accused of treason, tried, convicted and imprisoned. Against such arbitrary action, Parliament waged bitter and continuous opposition. After years of contention and oppression, a Parliamentary government was established for England, and with it members of Parliament gained an absolute privilege.

The privilege which had been a shield of defense, then became a sword of oppression. The Houses of Parliament by resolutions and otherwise greatly expanded their privilege and extended it to the servants and agents of the members of Parliament. It then became a means of very arbitrary and oppressive measures against individuals. Because Parliament was, in the beginning, "The High Court of Parliament," it continued to exercise judicial power. Its orders, judgments and processes became very oppressive and because it was the "Highest Court in the Realm," no appeal was permitted to other law courts. It was held that no inferior court could issue any process against the superior or supreme court. Subjects were condemned, imprisoned, deprived of their property and were denied the right of appeal to any court of law for relief.

But such conditions could not be endured by freedom-loving Englishmen. After more years of struggle, conflict and oppression, the claims of absolute privilege were curtailed. It became perfectly clear

> "that if the Commons were to be the sole judges of their privileges, free from restraints of the common law and the courts, they might make whatever extensions they might desire, and the abuse would become intolerable, for 'when supremacy and impunity go together, there is no remedy.' "[2]

To escape from such a dilemma, sweeping reforms and changes were made in the English constitutional and legal systems. The judicial power of Parliament was limited to a specially-trained and legally-expert group of Law Lords. The Supreme Court of Appeal became a specially-selected group of legally-trained members of the House of Lords. The Parliament at the same time became the supreme legislative authority. With the separation of legislative power from judicial power, the claims of privilege were made amenable to the common law of the land.

> "At present, there can be no privilege of Parliament that is not pleadable at law and examinable by the common-law courts, should it come before them in a judicial way. *Lex parliamenti* has at last become a part of the *lex terrae*.

> "It required almost five centuries to complete this process. * * * Privilege has been both the bulwark of English liberty and the most

1. The History of English Parliamentary Privilege, pp. 28 to 30, by Dean Carl Wittke; The Ohio State Universtiy Bulletin, 1921. See also Tenney v. Brandhove, 341 U.S. 367, at pages 372, and 373, et seq., 71 S.Ct. 783, 95 L.Ed. 1019, where the Colonial history or privilege is discussed.

2. Wittke, The History of English Parliamentary Privilege, p. 197.

ruthless oppressor of the rights of the subject. It has proved a means for the advancement of democracy and representative government and institutions in the hands of some, and again, it has been a tool of oppression in the hands of a corrupt, mercenary, time-serving oligarchy of politicians desirous of perpetuating their power. The proper adjustment of privilege to the other existing laws and institutions was worked out very slowly. With the rise of a sovereign Parliament in a democratic state, where all persons and all institutions seek protection under the aegis of one great common law, privilege of Parliament has lost its vital importance." [3]

### Theory

When the real theory and proper purpose of legislative privilege are considered, however, the claim of privilege is still important. The true concept of privilege is not a personal matter for the benefit of members of the Legislature; it was established and should be maintained for the benefit of the public whom the legislators represent. As stated in Cooley's Constitutional Limitations: [4]

"These privileges are thus secured, not with the intention of protecting the members against prosecutions for their own benefit, but to support the rights of the people, by enabling their representatives to execute the functions of their office without fear of prosecutions civil or criminal."

That statement reveals that the very purpose of the privilege confines it to legislative activity. Within that limitation, the privilege is absolute and the courts have universally recognized it. The public benefit which flows from the complete freedom of expression of legislators within the legislative halls is greater than any inconvenience or ill effect which it may occasion to individuals. Such privilege has been extended to statements made in Committee meetings and to publications of remarks of legislators and proceedings of the Legislature. But, as Cooley remarked:

"When a representative is not acting as a member of the house, he is not entitled to any privileges above his fellow-citizens; nor are the rights of the people affected if he is placed on the same ground on which his constituents stand."

The English decisions do not extend the privilege to publications, other than reports of legislative proceedings. A member of Parliament, it seems, has a right to publish his speech, but it must not be made the vehicle of slander against any individual, and if it is, it is a libel. [5]

### Language of the Constitution

The privilege granted by the Constitution is simply "for any Speech or Debate in either House." Courts have construed that grant of privilege liberally, in order to carry out its intent and purpose, but the courts have not gone so far as to extend the immunity to a publication not connected with the legislative process. It is recognized that Congress, Congressional Committees, and individual Congressmen, may issue and distribute general information. What is done in that way is left to the discretion of Congress and Congressmen. If, however, such a general publication, not a report of legislative procedure, contains a libel, there is no authority for saying that it is within the constitutional grant of immunity. The majority opinion refers to the "prerogative of Congress." Absolute prerogative passed out with "the Divine right of Kings."

It would be a mistake if our Constitution should be so liberally construed that this country would have to repeat the

---

3. Wittke, supra, p. 206.

4. 8th Ed., Vol. 2, p. 929, quoting from Coffin v. Coffin, 4 Mass. 1. See also Ten-

ney v. Brandhove, 341 U.S. 367, at page 373, 71 S.Ct. 783, 95 L.Ed. 1019.

5. Cooley's Constitutional Limitations, p. 948.

distressing history of privilege in England.[6] The language used in our Constitution should not be expanded beyond the meaning it had at the time of its adoption in the light of English history.

### The Publication

The handbook, which contains the alleged libel, states in its foreword:

> "The Senate Internal Security Sub-Committee presents this study of The Communist Party, USA—What It Is—How It Works—as a convenient handbook for Americans in an effort to counteract current misinformation regarding the Communist movement."

It is apparent that the handbook is a general publication. A limited number were first "printed for the use of the Committee on the Judiciary." It is conceded that it is now the purpose of the defendants to publish 75,000 additional copies for general distribution throughout the country, and the defendant, Buckley, "has caused to be printed 35,-000 copies of said handbook, and has sold to the public or agencies of the United States 17,950 copies of said handbook." It is conceded that this activity is something beyond strict legislative action. It seems clear that the handbook is beyond the absolute privilege.

But even if the publication is not within the absolute immunity, it does not follow that it is, therefore, unlawful or that a court of law will restrain its publication. The publication may still be within the discretion of Congress. Congress has a wide discretion in addition to its power to legislate. Courts have declined to take jurisdiction of complaints alleging that threatened legislative action is in disregard of constitutional restraints. Courts have uniformly declined to interfere with the exercise of legislative discretion. An ordinary citizen or taxpayer as such has no right to question or interfere with the exercise of Congressional discretion. The limitation on "the judicial Power of the United States" is expressed by the requirement that a litigant must have "standing to sue," and the controversy must be "justiciable." The scope and consequences of the review with which the judiciary is entrusted over executive and legislative action are discussed in Joint Anti-Fascist Refugee Committee v. McGrath, etc., 341 U.S. 123, at page 150, et seq., 71 S. Ct. 624, 95 L.Ed. 817.

The exigencies of our times and the insidious methods employed by those who seek the overthrow of our government, have imposed on Congress new and heavy responsibilities. The efforts, the diligence, and the accomplishments of Congress in the defense of our institutions, and the exposure of the error and evil ways of the champions and dupes of the Marxian dialectic deserve the highest commendation and the support of all loyal Americans. In opposing the evils of Communism, however, it is necessary to be on guard against the adoption of its destructive practices. In our defensive efforts we must not undermine or weaken the foundations of our government of law.

Congress has been aware of this need as shown by the enactment of the Subversive Activities Control Act, 50 U.S. C.A. § 781 et seq., the Internal Security Act, and the establishment of the Subversive Activities Control Board. An outline of procedure has been established for the determination and regulation of Communist-action organizations. This court understands and, for the purposes of the motion, must presume that the provisions of the Internal Security Act were not followed before the plaintiff in this case was declared to be a Communist affiliate. If the plaintiff is a Communist-front organization, it should be proceeded against according to the law which Congress has enacted. It should not be pilloried as a subversive agency before it has had an opportunity to be heard.

The complaint in this case, as has been said, is directed not against the publication of the handbook, but against the

---

**6.** As George Santayana said: "Those who do not remember the past are condemned to repeat it."

libelous statement concerning the plaintiff contained in the handbook. If counsel for the defendants had advised and persuaded the defendants to omit the challenged statement regarding the plaintiff, this litigation would have terminated and the publication of the handbook could have gone forward. The holding that courts of law have no jurisdiction over such a complaint is, in effect, to say that Congressmen, by Concurrent Resolution, may with impunity print, publish and broadcast a libelous statement against any person or association. If Congress has such power to publish a libel against this plaintiff, then it would have the same power to publish a libel against any other association, against a minority party in order to keep the present party in power, against any service club, chamber of commerce, or private corporation. Surely it should not be said that Congressmen are without any restraint regarding slander, libel and defamation.

### The Power of Courts

The defendants say, "The Court lacks jurisdiction of the subject matter in that Senate Concurrent Resolution 62 is not an act of Congress within the meaning of 28 U.S.C. Secs. 2282, 2284." It seems inconceivable that Congress would recognize the power of such a three-judge court as this to restrain "the enforcement, operation, or execution of any act of Congress or order of any department or agency of the United States for repugnance to the Constitution", and exclude from its consideration a Senate Concurrent Resolution.[7]

7. Counsel for the defendants also contended that this court was without power, because courts of equity generally have declined to restrain the publication of a slander or libel. This, however, is an entirely different case from the cases where courts of equity have refused to enjoin publication. In the cases where courts have declined to interfere, the defendant is usually an individual or a corporation engaged in private publishing business; here the defendants are officers and agents of government. In such cases the right of the defendant to publish generally is undisputed, and there is no

The complaint in this case seeks protection of the plaintiff's constitutional rights. If the publication of a libel is not within the legislative privilege, then it seems clear that such a court as is here constituted has authority to restrain publication of the challenged statement. When a Congressional Committee departs from the legislative halls and enters the publishing business, it ought to be subject to the same provisions of law regarding slander and libel that apply to other publishers, and since they act as agents of government, they should be subject to the same restraints imposed by law on "other departments or agencies of the United States."

### Government of Law

The issue raised by this case involves a basic and vital principle of our form of government. Twenty-five hundred years ago, Plato, in his philosophy of morals, law and government, which has been referred to as "the most brilliant achievement in the entire history of human thought," stated that the ideal government would be a government of law; strong enough to maintain lawful order and itself subject to law.

After two dozen centuries of political evolution, the founders of our government, "one of the most memorable assemblies the world has ever seen," provided the best embodiment of that principle. In the Federalist, which John Fiske pronounced "the greatest treatise on government that has ever been written," Hamilton said:

"In framing a government which is to be administered by men over

question as to the plaintiff's right to sue for damages resulting from a libel, or as to the defendant's duty to respond. In this case the complaint alleges that the publication of the libel has the appearance of a governmental finding or decree, would cause irreparable damage by destroying plaintiff's very existence, and that, therefore, suit for damages would not be an adequate remedy. This contention of the defendants is not mentioned in the majority opinion and therefore need not be discussed in this dissent, since it seems not to have been approved.

men, the great difficulty lies in this; you must first enable the government to control the governed; and, in the next place, oblige it to control itself."

The Constitutional division and balance of powers was an attempt to realize that ideal. In the critical period through which we are passing, our most urgent concern should be to preserve that Constitutional division and balance of powers which insures us a government of law.

The trend of our times and the critical emergencies that have confronted our government have given rise to accusations that each of the three principal branches of government, the legislative, the executive, and the judicial, has exceeded the limited power vested in it by the Constitution. Such accusations are unfortunate at this crucial time. The men at the head of the three divisions should set an example of strict observance of the limitations of power. That is necessary because of the necessity for the three separate divisions. At a time when the institutions which support our way of life are being defended against unscrupulous attack, all Americans, and especially officers of government, should encourage respect for government in all divisions.

The very form and purpose of our government, however, impose on the judiciary the responsibility of restraining unconstitutional or unlawful acts by agents of government. In a proper case, but only in a proper case, courts should meet that responsibility. The power of courts to restrain abuse of power can be directed only against the officers or agents charged with the execution of the challenged order or act. The power should be employed only when the reason for it is clear, and then the reason should be clearly stated.

It should be borne in mind, and this case exemplifies the fact, that the power of courts to restrain unlawful acts that impinge upon constitutional rights is not a phase of judicial power that needs to be feared. Courts can act only in cases duly presented according to law, and the judgment of the court in that case is the end of the court's power; in other words, courts cannot propose or initiate or spontaneously set in motion the exercise of judicial power. They act only according to law and judicial procedure, and the acts of all trial courts are subject to review.

Most accusations of abuse of judicial power are directed not against the judicial power to restrain, but against what is thought to be a trespass by judges in the legislative field. Such criticism involves the delicate question, When does interpretation of the law become legislation? and also the question whether a change or reversal of a former interpretation of long standing is a matter for the judiciary or the legislature. Such issues are not raised in a case like this, and this action should not be complicated by convictions or emotions regarding extraneous issues.

The virtue of our form of government lies in the balance that the division of powers creates. To a commendable extent the different divisions may counteract the excesses of one another, and when interpretation and action under a constitutional amendment proves more injurious than beneficial (as with the XVIIIth), the power is with the people to repeal or amend the constitutional provision. Always it should be kept in mind that our government is the best embodiment of the ideal of government by law. That is what distinguishes it from anarchy and all forms of despotism and totalitarianism. An officer is never more respectable than when he respects the law. As stated by the Supreme Court in United States v. Lee, 1882, 106 U.S. 196, at page 220, 1 S.Ct. 240, 261, 27 L.Ed. 171:

> "No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it. It is the only supreme power in our

system of government, and every man who by accepting office participates in its functions is only the more strongly bound to submit to that supremacy, and to observe the limitations which it imposes upon the exercise of the authority which it gives.

"Courts of justice are established, not only to decide upon the controverted rights of the citizens as against each other, but also upon rights in controversy between them and the government * * *."

And as Dean Pound said, in the last issue of the ABA Journal:

"The Constitution seeks to effect a balance. It is the function of the Court, as Coke told James I, to uphold the proposition that the ruler, whether King or popular majority, rules *sub deo et lege.* This may be a hard task now, as it was then. But the alternative is absolutism." [8]

### The Cases

A review of cases dealing with privilege fails to disclose a case exactly in point, possibly because no occasion arose. There are cases, however, that clearly indicate that Congressional privilege is not without limit.

In the case of Long v. Ansell, 63 App. D.C. 68, 69 F.2d 386, 389, 94 A.L.R. 1466, affirmed 293 U.S. 76, 55 S.Ct. 21, 79 L. Ed. 208, the court said:

"Defendant pitches his defense upon the exemption from arrest, and not upon his exemption from responsibility for statements made in his speech on the floor of the Senate. But were that claim advanced, it would be without force, since the acts charged have only remote connection with the speech. While the published articles were in part reproductions of the speech, the offense consists not in what was said in the Senate, but in the publication

and circularizing of the libelous documents."

In the case of Williams v. Anti-Defamation League, etc., (Sabath), 88 U.S. App.D.C. 99, 185 F.2d 1005, 1006, the plaintiff sought damages for an alleged libel. The defendant Sabath, a member of the House of Representatives of the United States, had caused to be published in the Appendix of the Congressional Record a letter from the Secretary of War, together with a prefatory statement by Sabath. The defendants asserted that the publication was privileged. The District Court dismissed the complaint with the statement " 'Privilege absolute. (Congressional).' " The Court of Appeals of this Circuit affirmed the judgment of the District Court, but for a different reason. The Court of Appeals examined the published statements and found them to be not libelous. The opinion closes with the remark:

"Entertaining the views expressed, it is not necessary for the court to rule on the pleas of privilege."

If the defense of privilege had been absolute, it would have been easier for the Court of Appeals to affirm on that ground.

In Tenney v. Brandhove, 341 U.S. 367, at pages 376–377, 71 S.Ct. 783, at page 788, it is said:

"We come then to the question whether from the pleadings it appears that the defendants were acting in the sphere of legitimate legislative activity. Legislatures may not of course acquire power by an unwarranted extension of privilege. The House of Commons' claim of power to establish the limits of its privilege has been little more than a pretense since Ashby v. White, 2 Ld.Raym. 938, 3 Id. 320. This Court has not hesitated to sustain the rights of private individuals when it found Congress was acting outside

8. ABA Journal, Vol. 42, No. 5, p. 432. For an interesting and instructive discussion of "prerogative" and "judicial review," see The "Higher Law," Back-ground of American Constitutional Law, by Edward S. Corwin, Great Seal Books, Cornell University Press, Ithaca, N. Y.

its Legislative role. Kilbourn v. Thompson, 103 U.S. 168, 26 L.Ed. 377; Marshall v. Gordon, 243 U.S. 521, 37 S.Ct. 448, 61 L.Ed 881; compare McGrain v. Daugherty, 273 U.S. 135, 176, 47 S.Ct. 319, 329, 71 L.Ed. 580."

This case is subject to principles announced in Kilbourn v. Thompson, 103 U.S. 168, 26 L.Ed. 377; Joint Anti-Fascist Refugee Committee v. McGrath, Attorney General, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817; Youngstown Sheet & Tube Co., v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153.

It is my opinion that the motion of the defendants to dismiss the complaint or for summary judgment should be overruled, and the motion of the plaintiff for a temporary or interlocutory injunction should be granted to restrain the defendants, Blattenberger, the Public Printer, and Buckley, the Superintendent of Documents, from publishing the statement that the plaintiff is a Communist-action organization or a Communist front.