COLL, PLAINTIFF AND APPELLANT, *v.* GANDÍA,
DEFENDANT AND APPELLEE.

APPEAL from the District Court of San Juan in an Action
for Damages for Libel.

No. 2300.—Decided July 28, 1921.

LIBEL—PRIVILEGED COMMUNICATION—PLEADING.—When in an action for damages
for libel the libel is alleged to have been committed in a document which is
*prima facie* privileged, as is a communication addressed to one of the houses
of the Legislature, the plaintiff is under the obligation, in order that the
complaint may be said to state facts sufficient to constitute a cause of action,
to allege facts sufficient to destroy the presumption that the document is a
privileged communication, and if this is not done a demurrer for lack of
facts should be sustained.

The facts are stated in the opinion.

*Mr. G. Cruzado* for the appellant.

*Mr. J. Guzmán Benítez* for the appellee.

MR. JUSTICE HUTCHISON delivered the opinion of the court.

The district court dismised an action for libel after sus-
taining a demurrer for want of facts sufficient to constitute
a cause of action.

One of the grounds upon which the district judge based
his ruling was that "the writing addressed by Pedro Gan-
día to the House of Representatives of Porto Rico, and
which forms a part of the complaint, is of a privileged char-
acter." The only error assigned is that "the District Court
of San Juan, First Section, erred in sustaining the demurrer
on the ground of lack of a cause of action, basing its judg-
ment upon the fact that the writing accompanying the com-
plaint and addressed by Pedro Gandía Córdova to the House
of Representatives is of a privileged nature and in failing
to consider said circumstance as a matter of defense."

Plaintiff alleged:

"1. That he is of age, married and a resident of San Juan; that
he practices the professions of attorney-at-law and notary public in
the Island of Porto Rico and specially before this court, being also

a member of the House of Representatives of Porto Rico, to which he was elected by the vote of the electors at the last general election held in Porto Rico.

"2. That in his capacity of attorney-at-law the plaintiff represents certain clients before the courts of Porto Rico in actions and proceedings brought against them by defendant Pedro Gandía, among them a certiorari proceeding brought by the plaintiff as attorney for the Porto Rico Fertilizer Company in the Supreme Court of Porto Rico against a certain order of the District Court of San Juan, Second Section.

"3. That besides being a member of the House of Representatives the plaintiff is the Chairman of the Civil Judiciary Committee thereof, one of the most important committees of the Legislature; and as attorney-at-law he represents a number of important companies and corporations and has a law office of considerable importance and repute.

"4. That in a suit brought by defendant Pedro Gandía against the Porto Rico Fertilizer Company the plaintiff, in representation of the said corporation, successfully opposed the motion made by the defendant for an examination of the books of that corporation, except in the manner accepted by the said corporation, and a certain order having been made which was considered by the plaintiff as prejudicial to the interests of his client, the said plaintiff filed in the Supreme Court of Porto Rico a petition for the writ of certiorari referred to in the second count of the complaint, which was not issued because the Supreme Court was in vacation.

"5. That at or about that time and especially on September 5, 1917, the Legislature of Porto Rico was in session and the Secretary read before the House of Representatives a writing, a certified copy thereof being attached to as part of this complaint, signed by Pedro Gandía, the defendant, wherein defendant Gandía falsely, maliciously, knowingly and without a probable cause accused the plaintiff of unduly using his office as such Representative in order to obtain an amendment to an existing law in Porto Rico with the sole object of benefit to himself and his client.

"6. That that writing constitutes a false and malicious imputation made knowingly by the defendant against the plaintiff and without any probable cause, with the sole object of injuring and causing damage to him in his reputation as an attorney and member of the House of Representatives.

"7. That the conduct of the defendant in the manner stated in this complaint has caused damages to. the plaintiff in the sum of fifty thousand dollars."

The exhibit referred to reads thus:

"To the House of Representatives of Porto Rico:—The undersigned, an American citizen, merchant and resident of San Juan, respectfully states to the House of Representatives of Porto Rico that according to his information Representative Lastra Charriez has presented before the House the following bill:

" 'H. B. 75.—In the House of Representatives of Porto Rico.— August 30, 1917.—Mr. Lastra Charriez presented the following bill: To amend the Act authorizing writs. of certiorari approved March 10, 1904.—Be it enacted by the Legislative Assembly of Porto Rico.— Section 1.—Section 2 of the Act authorizing writs of certiorari, approved March 10, 1904, shall read hereafter as follows:—''Section 2.—The Supreme Court or any justice thereof and the respective district courts of Porto Rico are hereby authorized and empowered to issue writs of certiorari.''—Section 2.—All laws or parts of laws in conflict with this Act are hereby repealed.—Section 3.—This Act shall take effect immediately after its approval, it being urgent so that the justice in charge during the present vacation of the said court may have the authority hereby granted to him.'

"The undersigned knows also that among the Representatives constituting the committee on legislation of that House is Cayetano Coll y Cuchí who not long ago, while in the office of the Clerk of the Supreme Court and in view of the fact that a writ of certiorari by him petitioned for in the suit hereinafter mentioned was not promptly issued, stated that he would introduce a bill for an amendment to the present certiorari law, and the writer can assert that the passage of said law specially favors said Coll y Cuchí as attorney of The Porto Rico Fertilizer Company in the aforesaid suit No. 9463 brought by the undersigned as plaintiff against the said corporation in the District Court of San Juan, Section 1, for the collection of money and other relief; that the benefit to be obtained by said attorney and client is the obstruction and delay in the examination of the books of the defendant corporation which was moved for by the undersigned in February of the current year and has met with great difficulties for its discussion, due to the obstacles and delays presented by said attorney Coll y Cuchí, in-

cluding the privilege of a Representative invoked by him, until the rendition of the order of the district court of June 7 of the current year.

"Although this order was made, the said inspection has not been made up to this time, notwithstanding the consecutive orders of the court and the admonitions that disobedience would be punished as contempt of court, due to the fact that Coll y Cuchí has prevented compliance with said order of the court by having personally opposed the same, alleging several pretexts, and having also kept in his own office the books which will be the subject of the said inspection.

"Before Coll y Cuchí decided to take that course he appeared before Mr. Justice Hutchison with a petition for a writ of certiorari to stay the proceedings concerning the ocular inspection ordered by the court; but Mr. Justice Hutchison having referred the petition to the Supreme Court, which is now in vacation and will not meet until November 5th, Coll Cuchí now proposes that a law be passed authorizing the issuance of writs of certiorari during these vacations, so that the action taken by the undersigned for the inspection ordered by the court be stayed.

"It having been shown that the legislative measure to which I refer is for the personal benefit of attorney Cayetano Coll y Cuchí and his client, The Porto Rico Fertilizer Company, and will seriously injure the interests of the undersigned, I petition the House of Representatives that before approving the favorable report of the Committee on Legislation an investigation be ordered so that the aforesaid facts may be ascertained, and to permit the undersigned, should the House deem it necessary, to be heard by the commission that may be designated through the attorney representing him in the suit involved.—San Juan, P. R., September 5, 1917.— Very respectfully, (Sd.) Pedro Gandía Córdova."

Appellant, in support of his contention, cites but three authorities, to wit: *Gudger v. Penland*, 23 A. S. R. 73; *Conroy v. Pittsburg Times*, decided by the Supreme Court of Pennsylvania January 5, 1891, and *Dixon v. Allen*, 11 Cal. 179.

The case first mentioned was an "appeal from a judgment overruling a demurrer to a complaint in slander, alleg-

ing that defendant had orally charged plaintiff with having sworn to certain lies while being examined as a witness in a certain criminal case.''

The court said (italics ours):

''The contention of the defendant's counsel that the slanderous language appeared to have been used while a judicial investigation was progressing, and that under the principle stated in Nisson v. Cramer, 104 N. C. 574, the defendant is absolutely exempt from liability, *finds no support in the admitted allegations of the complaint. It does not appear affirmatively in the complaint* whether the language imputed to the defendant in either of the paragraphs of the complaint, setting forth specific language in which the charge was couched on different occasions, was spoken at the time of the trial of the criminal action, or afterwards. The plaintiff was not required *to negative the idea* that the words slanderous *per se* were uttered under such circumstances that the defendant would be protected from liability on the ground of privilege. The fact, if true, that the words were uttered in the course of judicial proceeding, and were relevant and pertinent to the matter before the court, must be set up in the answer, if the defendant wishes to avail himself of it in his defense, *unless it be gratuitously alleged in the complaint.*

''*If it had been alleged* that the language was spoken when the defendant was being examined as a witness on the trial of the indictment, *still it does not appear* that the defendant sustained such relation to the prosecutor as to furnish *absolute or presumptive* protection against liability: Nissen v. Cramer, 104 N. C. 574; Shelfer v. Gooding, 2 Jones, 175; Briggs v. Byrd, 12 Ired. 380. *There is nothing alleged in the complaint* that will support the contention of the defendant's counsel that the action can not be maintained.''

The *Conroy Case,* cited by date only, is reported in 21 Atl. at page 154. Plaintiff therein offered in evidence a newspaper article the general character of which is indicated by the opening phrases, which would seem to be headlines although it is not so stated, and which are as follows:

''The dives must go. Bad folks leave the town. Another scheme of old man Godfrey's exposed. Bill Lannon in jail. 'Humpy' Long closes. Ella Godfrey returns.''

The portion of the article referring to the plaintiff is the following:

"At No. 2 Diamond Square Mike Conroy runs a joint that is every bit as bad as the one Tom O'Brien used to run. In no way has he been put out by Mayor McCallin's demonstration in favor of morality and good order. The low characters that have been barred out of the other places in the vicinity, all flock into Conroy's and are made welcome. A one-legged dancer has been employed, and makes the night hideous in his attempts to keep time to the jangling of the wretched instrument that was once a piano. Conroy also has a habit of closing his front doors about midnight, and keeping the crowd in the back room until near morning, or until they run short of money, or his beer gives out. Every night at his place can be seen thieves, sand-baggers, pickpockets, and the lowest of abandoned women. The one-legged clogdancer employed in this place is a noted crook. He has served several years in the penitentiary for highway robbery, and has only been at liberty a few months. Conroy need not be surprised to see a delegation of Mayor McCallin's police walk down that way some time, and stay just long enough to do business with the proprietor and the inmates."

No question of absolute privilege seems to have been raised and obviously no such question could have been in the mind of the court. Defendant did claim, however, "that the article was a privileged communication and moved for a compulsory nonsuit." That what was said in the opinion had reference only to a qualified privilege is shown by the following extract from the first paragraph (italics ours):

"The publication complained of by appellant charges an indictable offense, and is libelous per se. It may be conceded that *it belongs to the class of qualified privilege. In such cases* it is common to say that the plaintiff must prove express malice. I apprehend, however, that the more accurate statement of the law is that *in such cases* there is no prima facie presumption of malice from publication. There must be some evidence beyond the mere fact of publication, but there is no requirement as to what the form of the evidence shall be. It may be intrinsic, from the style and tone of the article."

The only case of *Dixon* v. *Allen* that we find in the California reports is at page 527 of volume 69, where the syllabus says that:

"The plaintiff, at the time of the publication complained of, was a pupil in the State Normal School at San José, of which defendant was the principal. The alleged libel consisted of a portion of a letter written by the defendant, and by him caused to be published in a newspaper, in which it was said of and concerning the plaintiff as such pupil that 'by her conduct in class, by her behavior in and about the building, and by her spirit as exhibited in numberless personal interviews, she has shown herself tricky and unreliable, and almost entirely destitute of those womanly and honorable characteristics that should be the first requisites in a teacher.' The letter was written in reply to certain censorious articles that had appeared in the public press reflecting upon the faculty and management of the normal school in connection with their treatment of the plaintiff."

In that case, appellant insisted that the complaint was subject to demurrer because it did not "allege in express terms that the publication was not privileged."

Upon this point the court said (italics ours):

"When language is actionable, *and it does not appear that it is privileged,* it is presumed to be both false and malicious, and no other evidence of falsehood or malice is necessary than the publication itself. (Townshend, 388.) And the malice presumed in a false publication can be evaded in but one way, and that is by showing a legal excuse for the act of publication; i. e., by showing that it was privileged."

Here also the only question of privilege that could have been suggested was one of qualified privilege. Indeed, the argument of appellant in the instant case seems to assume, without the remotest suggestion of any reason for such an hypothesis, that the privilege claimed for the exhibit herein is no more than a qualified privilege. But although, beyond this tacit assumption upon the part of appellant, neither of the briefs attempts to draw any such distinction, and while

we have had but little time or disposition for independent investigation of the matter, the soundness of the theory upon which appellant seems to have proceeded is, to say the least, not self-evident.

After classifying privileged occasions, Mr. Newell, speaking, of those absolutely privileged, says at page 508, section 506, of his work on Slander and Libel that:

"In this class of cases it is considered in the interest of public welfare that all persons should be allowed to express their sentiments and speak their minds fully and fearlessly upon all questions and subjects; and all actions for words so spoken are absolutely forbidden, even if it be alleged and proved that the words were spoken falsely, knowingly and with express malice."

And at page 510, section 510, we find that:

"Petitions and memorials presented to the Legislature relative to proceedings to which they are pertinent are absolutely privileged. So is a petition to a committee of either house."

In *Lake* v. *King,* cited in support of this proposition:

"The plaintiff declared that for the six last years, he was a doctor of laws, and vicar general to the Bishop of Lincoln, throughout the whole diocese; in which office he had demeaned himself justly and uncorruptly, without any extortion, corruption, or oppression; yet the defendant on the first day of December, in the 18th year of the reign of the now king, caused to be printed and delivered, published and dispersed to divers subjects of our said lord the now king, a certain false, malicious and scandalous libel of the plaintiff, in the execution of his office, in this form, viz. 'To the honorable the Committee of Parliament for Grievances, the humble petition of Edward King, of Gray's Inn, in the county of Middlesex, Esquire, sheweth,' etc. (and in fact the petition charged the plaintiff with many horrible and great abuses, such as extortion, oppression, vexation, and other misdemeanors in his office), whereas in truth (as the plaintiff averred) all the matter contained in the said libel was false and malicious, to the damage of the plaintiff, &c.

     \*     \*     \*     \*     \*     \*     \*

"And this case was often times debated. And it was agreed

that the exhibiting of the petition to a Committee of Parliament was lawful, and that no action lies for it, although the matter contained in the petition was false and scandalous, because it is in a summary course of justice, and before those who have power to examine whether it be true or false.'' English Reports, Reprint, vol. 85, page 137.

We do not have access to the case of *Cook* v. *Hill,* cited in the same connection, but in another New York case, *Woods* v. *Wiman,* 122 N. Y., 445, Book XXV, N. Y. Court of Appeals, Rev. Ed., page 354, the court, speaking through Follet, Ch. J., said:

"Whether the public statutes of the State shall be changed is a matter of general interest and of common concern, and information given to the governor for the purpose of influencing his action on a bill which has passed the Legislature is prima facie privileged; but if the communication contains defamatory matter and is unnecessarily published to others, such publication is not privileged. Coffin v. Coffin, 4 Mass. 1; 3 Am. Dec. 189; Rex v. Creevey, 1 M. & S. 273; Odgers L. & S. (2d ed.) 186; Folkard Starkie L. & S. 202, 205; Newell Def. 471; Townsh. L. & S. (4th ed.) 217.''

We would not be understood at this time as adopting without qualification the rule above suggested with reference to communications said to be absolutely privileged. Attention is called to the distinction usually drawn in this regard merely in order to emphasize the necessity of a clear and uncontradicted averment as to express malice and want of probable cause as well as of full and convincing proof in this regard. Certainly the well-known rule in this respect, even though it were not rigidly enforced in cases involving a qualified privilege only, should never be relaxed if once extended to include judicial and legislative proceedings.

We are of course aware of the limitations placed upon the English rule in *White* v. *Nicholls,* 44 U. S. 266, mentioned by us in *Franco* v. *Martínez, ante,* page 221, and tacitly reaffirmed in *Nalle* v. *Oyster,* 230 U. S. 165. Although the doc-

trine there announced does not seem to have met with universal acceptance (see *Shelfer* v. *Gooding,* 2 Jones (N. C.) 181; *Johnson* v. *Brown,* 13 W. V. 119, 17 R. C. L. pages 330 *et seq.*), we need not at this time take issue therewith, assuming that we are at liberty to do so.

The conclusions reached in the *Nicholls Case* are briefly summed up in the opinion as follows:

"The investigation has conducted us to the following conclusions, which we propound as the law applicable thereto. 1. That every publication, either by writing, printing, or pictures, which charges upon or imputes to any person that which renders him liable to punishment, or which is calculated to make him infamous, or odious, or ridiculous, is *prima facie* a libel, and implies malice in the author and publisher towards the person concerning whom such publication is made. Proof of malice, therefore, in the cases just described, can never be required of the party complaining beyond the proof of the publication itself; justification, excuse, or extenuation, if either can be shown, must proceed from the defendant. 2. That the description of cases recognized as privileged communications, must be understood as exceptions to this rule, and as being founded upon some apparently recognized obligation or motive, legal, moral, or social, which may fairly be presumed to have led to the publication, and therefore *prima facie* relieves it from that just implication from which the general rule of the law is deduced. The rule of evidence, as to such cases, is accordingly so far changed as to impose it on the plaintiff to remove those presumptions flowing from the seeming obligations and situations of the parties, and to require of him to bring home to the defendant the existence of malice as the true motive of his conduct. Beyond this extent no presumption can be permitted to operate, much less be made to sanctify the indulgence of malice, however wicked, however express, under the protection of legal forms. We conclude then that malice may be proved, though alleged to have existed in the proceedings before a court, or legislative body, or any other tribunal or authority, although such court, legislative body, or other tribunal, may have been the appropriate authority for redressing the grievance represented to it; and that proof of express malice in any written publication, petition or proceeding, addressed to such tribunal, will render that publication,

petition or proceeding, libelous in its character, and actionable, and will subject the author and publisher thereof to all the consequences of libel. And we think that in every case of a proceeding like those just enumerated, falsehood and the absence of probable cause will amount to proof of malice.''

The burden was upon appellant to show that his complaint stated facts sufficient to constitute a cause of action on a communication *prima facie* privileged, and not only has he wholly failed to do this, but we think a careful examination of the pleading, without the aid of argument or more specific reference, will disclose an obvious inconsistency between the averment as to malice and want of probable cause and the other facts alleged or otherwise apparent from the face of the document in question. For the purposes of this opinion it may be conceded that in the absence of any such contradiction the case of *Nalle* v. *Oyster, supra,* would be sufficient authority for a reversal. But in the case at bar we are unable to say with reference to the charge of malice, falsehood and the want of probable cause, as did the Supreme Court of the United States in the *Oyster Case,* that ''the averment of these facts is not negatived or qualified by anything else that appears'' in the complaint.

The judgment appealed from must be

*Affirmed.*

Chief Justice Hernández and Justices Wolf, Del Toro and Aldrey concurred.