184 So.2d 428 (1966)
Irving G. McNAYR, Petitioner,
v.
Thomas J. KELLY, Respondent.
No. 34593.
Supreme Court of Florida.
March 23, 1966.
Thomas C. Britton, Miami, for petitioner.
Milton M. Ferrell and J.M. Flowers, Miami, for respondent.
Earl Faircloth, Atty. Gen., and Gerald Mager, Asst. Atty. Gen., amici curiae.
DREW, Justice.
This case is before us for review on a petition for certiorari accompanied by a certificate of the District Court of Appeal, Third District, "that the decision of this court `passes upon a question of great public interest' in that our decision involves the question of whether executive officials of *429 county government are absolutely privileged as to defamatory publications made in connection with their office."[1] Thus the issues are clearly defined. That the publication was defamatory; that they were made in connection with the office and arose out of an official and authorized act; that the county official was an "executive official" of Dade County, are all admitted. The sole question for our decision  and admittedly one of profound importance to the public  is whether such publications are absolutely privileged; that is to say, whether, no matter how false or malicious words spoken or written by an executive official of government may be, such public servant is protected by the law from suit or damages by or in the favor of the person wronged. That such protection is afforded public servants in the judicial and legislative branch of government is not questioned. The question here, as we have stated, is whether the same immunity should be extended to the executive branch of government. We think it should  but before discussing the question and our reasons for this conclusion, a statement of the factual background of this litigation seems appropriate.
Metropolitan government in Dade County has no counterpart in this State. "Metro", as it is commonly called, was authorized by an amendment to the Florida Constitution in 1956.[2] Pursuant to this amendment the people of Dade County adopted a charter and under the authority of this charter Dade County was ruled through a legislative body known as the Board of County Commissioners. This board acted through ordinances, exercising thereby the very broad powers granted under the Constitution and charter. In Dade County v. Kelly[3] (the same person involved here), this Court held that the office of Sheriff of Dade County (as it existed prior to Metro) could be completely abolished by the County Commissioners and a new department known as the Department of Public Safety created in its stead to be directed by a Public Safety Director. We further held in that case that the County Manager of Metro had the power "to hire the [sheriff] on a daily basis to serve at the will of the manager and to fire him without cause or notice."[4] It is pertinent here to observe that inherent in the holding in Kelly, supra, was the conclusion that the power of the Governor under the Constitution to suspend constitutional officers of this State was not affected by the Metro charter. It was simply a case of concurrent power  which in the instance there, was exercised first by the County Manager. This fact is noted only because the law is crystal clear that had the Governor suspended the sheriff and had he then published the libel in reporting his actions to the Board of County Commissioners, his actions would have been absolutely privileged.[5] And this is true no matter how malicious the Governor's actions had been or the great extent of the damages to Kelly by virtue of such publication. It would seem incongruous to make fish of one and fowl of the other; but this is just an example of the difficulty of the question presented and the desirability  or practical necessity  of extending to the executive branch at all levels the same immunity that has for ages been accorded the legislative *430 and judicial branches. If areas of absolute immunity and qualified immunity are to be carved out of the executive branches of government, it should more appropriately  and historically more properly  be done by the legislative branch.[6]
Another point material to this decision is the fact that the County Manager is appointed by and is answerable to the Board of County Commissioners. It is true that the County Manager could primarily dispense with the services of the sheriff  as he did  without any prior approval by the Board of County Commissioners, but any successor had to be approved by such Board at a subsequent meeting. It was after the County Manager, McNayr, petitioner here, had fired  or to use a kinder term  dispensed with the services of Kelly[7] that the former delivered to each member of the Board a report of his actions and reasons therefor which were admittedly libelous. Kelly argues that, inasmuch as McNayr was not required to report his reasons for dismissing Kelly, his actions in doing so were beyond any duty or obligation imposed on him and therefore he was not performing any duty of the office of County Manager and was therefore beyond the pale of protection which would otherwise be afforded to him, even if his communications in the line of duty were absolutely privileged. We can accept neither the premise nor the argument. While he had no positive duty to discuss the matter of dispensing with Kelly's services with the Board of County Commissioners as a condition precedent to effectively and conclusively taking action, as the appointee of the Board and its chief executive officer, he was bound by the very nature of the act itself and the impact on public opinion of discharging a high elective official summarily, to keep the Board advised of his actions and his reasons therefor. The Board, as the legislative body of the county  the people's representatives  was bound to be either praised or criticised  or at the very least  questioned concerning such action. Moreover, while the Board had no power to interfere directly with the Manager's action in dispensing with Kelly's services, the Manager was answerable to the Board for all of his actions as everyone knows from everyday experience and common sense. So, we have no difficulty in resolving that the Manager was acting within the orbit of his duties and responsibilities in making the report to the Board of County Commissioners.
We now turn to the basic question before us. Are actions of executive officials absolutely privileged as to defamatory publications made in connection with their office?
It seems to be well settled in this State that words spoken or written by public servants in judicial and legislative activities are protected by absolute privilege from liability for defamation. However false or malicious or badly motivated the accusation may be, no action will lie therefor in this State.[8] Nor is it questioned that such absolute immunity in this State extends to county and municipal officials in legislative or quasi-legislative activities as well as to members of the State Legislature and activities connected with State legislation.[9] It is also pertinent to note that in this strange area where the courts seem to have originated the idea of absolute immunity instead *431 of the legislatures, Florida has followed the weight of authority in dealing with questions arising under the broad principle whenever it has been presented to it.[10] In stating the grounds upon which the rule of absolute privilege is sustained as to judicial proceedings, this Court has said that all persons connected therewith should be free of fear of being called upon to defend suits arising as a result of derogatory disclosures. The question, however, of absolute immunity to those engaged in the executive branches of government is one of somewhat modern origin. In Barr v. Matteo[11] in an opinion by Mr. Justice Harlan, the U.S. Supreme Court held that the same absolute immunity which the courts had heretofore universally extended to the legislative and judicial branches of government should be accorded to those in the executive branch. Admittedly the question is a difficult one not only for the reasons heretofore stated in this opinion but because of the impact of constitutional provisions such as the provision of our Declaration of Rights which provides that the courts of this State shall be open so that every person for any injury done him in his lands, goods, person or reputation shall have remedy by due course of law and that right and justice should be administered without sale, denial or delay. In Barr v. Matteo, the majority opinion adopted the language of Judge Learned Hand in Gregoire v. Biddle, 2 Cir., 177 F.2d 579-581, as the rationale upon which the basic decision was reached. This excellent dissertation so effectively presents and disposes of the arguments on both sides that it is again quoted in the footnote of this opinion.[12]
In the interest of brevity it is observed that in the majority and dissenting opinions in Barr v. Matteo and in the footnotes attached there is a collation of all of the pertinent authorities upon this subject and we will only refer hereafter to a few of these *432 authorities to illustrate some particular point.
In our research we have concluded that the great weight of authority now recognizes no distinction between executive officials of government and judicial or legislative officials of government on this question of immunity, and this, for the reasons which we have heretofore alluded to, should be so. The complexities of modern day living and of government and the problems presented by our ever expanding population have altered many of the distinctions which were ancient concepts in the separation of powers so that today many of the functions of what were formerly legislative and judicial powers have been carried over into the executive branches. We note that in the decision of the district court of appeal under review the statement is made that "other states nevertheless continued to apply qualified privilege to executive officers." The district court cited five decisions in support of this pronouncement but we agree with the analysis of these decisions made in the brief of the county that such decisions do not support the pronouncement of the district court. Two dealt with the admittedly absolutely privileged acts of a legislative body. The Michigan case decided in 1925 related to the executive branch but apparently has been later overruled by Schlinkert v. Henderson.[13] In another, only qualified privilege was claimed so the question of absolute privilege was neither presented nor discussed and the last case involved a letter from a mailman to a postmaster general concerning a local postmaster. It would be rather difficult to categorize a mailman in respect as a member of the executive branch of government.
We quote in the footnote[14] decisions of many other states, law review articles and other authorities supporting the theory of absolute privilege to members of the executive branch.
As a concluding observation, were we to agree to the theory of qualified privilege it would make the courts an arbiter between men rather than between causes. It would place the litigant in the position in every case where defamatory statements were made by others than "high government officials" of having to institute suit to determine in the first instance whether he had a cause of action and then place the awesome responsibility upon the courts of determining whether they would allow a suit to be maintained against the particular individual sued. We think that there should be no distinction between the judicial, legislative and the executive branches of government so far as absolute privilege is concerned. If a distinction is to be made, as we have heretofore stated, it should be made by the legislative branch of government.
*433 In summary, we hold that executive officials of government are absolutely privileged as to defamatory publications made in connection with the performance of the duties and responsibilities of their office to the same extent as such absolute immunity is afforded to members of the legislative and judicial branches of government.
The decision of the district court of appeal is quashed and the cause remanded for further proceedings not inconsistent with the views herein expressed.
THORNAL, C.J., and THOMAS, O'CONNELL and HOBSON (Retired), JJ., concur.
NOTES
[1] The case in the District Court of Appeal is reported in 175 So.2d 568.
[2] Art. VIII, Sec. 11, Florida Constitution, F.S.A.
[3] Florida 1963, 153 So.2d 822.
[4] In connection with the italicized language we observed:

"To the argument that such arbitrary power was never intended or, if intended, is violative of the Constitution of the State of Florida, we can only hold that, although it may be bad government, it is not unconstitutional because, at the behest of Dade County, the people of Florida approved the Amendment, supra, which granted the right to exercise such powers. * * *"
[5] Chatterton v. Secretary of State for India, 2 Q.B. 189. Gray, Private Wrongs of Public Servants, 47 Cal.L.Rev. 303, 20 Fla.Jur., Libel and Slander 66.
[6] The Legislature, for example, could extend absolute immunity to certain high state, county or municipal officials or do away with the immunity altogether. This Court, in the exercise of its judicial powers, decides cases  it does not reach into the future and decide controversies not yet arisen. Historically, the Legislature draws the fine lines between lawful and unlawful conduct and between acts which are the basis for actions for damages.
[7] This action resulted in an injunction restoring Kelly to office which was reversed by this Court in the Kelly case heretofore discussed and cited in footnote 3.
[8] Coogler v. Rhodes (1897), 38 Fla. 240, 21 So. 109.
[9] Robertson v. Industrial Insurance Company (Fla. 1954) 75 So.2d 198, 45 A.L.R.2d 1292.
[10] Budd v. J.Y. Gooch Co., Inc., (1946) 157 Fla. 716, 27 So.2d 72. See also Robertson v. Industrial Insurance Company, footnote 9 supra.
[11] 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959).
[12] "`It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation. * * *

"`The decisions have, indeed, always imposed as a limitation upon the immunity that the official's act must have been within the scope of his powers; and it can be argued that official powers, since they exist only for the public good, never cover occasions where the public good is not their aim, and hence that to exercise a power dishonestly is necessarily to overstep its bounds. A moment's reflection shows, however, that that cannot be the meaning of the limitation without defeating the whole doctrine. What is meant by saying that the officer must be acting within his power cannot be more than that the occasion must be such as would have justified the act, if he had been using his power for any of the purposes on whose account it was vested in him. * * *'"
[13] 331 Michigan 284, 49 N.W. 180.
[14] Montgomery v. City of Philadelphia, 392 Pa. 178, 140 A.2d 100 (1958); Trebilcock v. Anderson, 117 Mich. 39, 75 N.W. 129 (1898); Larson v. Doner, 32 Ill. App.2d 471, 178 N.E.2d 399 (1961); Adams v. Tatsch, 68 N.M. 446, 362 P.2d 984 (1961); McAlister & Co. v. Jenkins, 214 Ky. 802, 284 S.W. 88, 91 (1926); Sanford v. Howard, 185 Okla. 660, 95 P.2d 644, 647 (1939); Bigelow v. Brumley, 138 Ohio 574, 37 N.E.2d 584 (1941); Samuelson v. Vinyard, 251 P. 719, 120 Or. 197 (1926); Bolton v. Walker, 197 Mich. 699, 164 N.W. 420 (1917); Schlinkert v. Henderson, 331 Mich. 284, 49 N.W.2d 180 (1951); DeBolt v. McBrien, 96 Neb. 237, 147 N.W. 462 (1914); Catron v. Jasper, 303 Ky. 598, 198 S.W.2d 322 (1946); Reagan v. Guardian Life Ins. Co., 140 Tex. 105, 166 S.W.2d 909 (1942); Matson v. Margiotti, 371 Pa. 188, 88 A.2d 892 (1952); Hughes v. Bizzell, 189 Okla. 472, 117 P.2d 763, 765 (1941); Shade v. Bowers, Ohio Com. Pl., 199 N.E.2d 131 (1962); 69 Harvard Law Review 875 (1956); 74 Harvard Law Review 44 (1960-61); 58 Michigan Law Review 295-297 (1959-60); 38 Texas Law Review 107 (1959-60); "The Right to Communicate," by Dean Leon Green, 35 New York University Law Review, 903, 908 (1960).