Argued and submitted December 6, 1982, affirmed November 1, 1983

## ADAMSON,
*Respondent on Review,*

*v.*

## BONESTEELE,
*Petitioner on Review.*

(NO. 114824, CA A22138, SC 28914)

671 P2d 693

Asa L. Lewelling, Salem, argued the cause for petitioner on review. With him on the briefs was William G. Blair, Assistant City Attorney, Salem.

William F. Frye, Eugene, argued the cause for respondent on review. On the brief were Donald A. Bick, Bick & Monte, and Frye, Hanna & Veralrud, Eugene.

Before Lent, Chief Justice,** and Linde, Peterson,*** Campbell and Roberts, Justices.

LENT, J.

Linde, J., concurred and filed an opinion.

---

** Chief Justice when this case was argued.
*** Chief Justice when this decision was rendered.

## LENT, J.

The issue is whether in an action for defamation the defense of absolute privilege protects a city councilman's speech uttered outside the council assembly in answer to a newspaper reporter's questions concerning pending council legislative business. We hold such speech is not absolutely privileged.

Defendant was a member of the Salem City Council. The council had formed an ambulance advisory committee of which the defendant was chairman.[1] The committee was responsible for making recommendations to the council on ambulance rates and services.

Plaintiff operated an ambulance service in Salem. He had requested a rate increase, and the committee met to consider it. The morning after the committee meeting, the defendant received a telephone call at his office from a reporter for a daily newspaper of general circulation in the

---

[1]

"15.010. SALEM AMBULANCE ADVISORY COMMITTEE. The Salem Ambulance Advisory Committee is hereby created. The committee shall consist of the city administrator or his designee, the director of finance, and six other members appointed by the mayor for two year terms as follows:

"(a) A representative from both the Salem General and the Salem Memorial Units of the Salem Hospital.

"(b) Two councilpersons.

"(c) Two at large members from the general public.

"The committee shall select as chairman one of the councilpersons. (Ord No. 68-70; Ord No. 131-75; Ord No. 7-79)

"15.020. ADVISORY FUNCTION OF COMMITTEE. The Salem Ambulance Advisory Committee shall be an advisory body to the common council whose functions shall include:

"(a) Promoting methods and procedures for and suggesting improvements in the operation of all licensed ambulances in the City of Salem.

"(b) Advising with reference to relations between the licensed ambulance operators and the hospitals of the city.

"(c) Investigating, reviewing and making suggestions to the council in reference to the rates to be charged and the services to be rendered by licensed operators of ambulances serving the City of Salem.

"All requests for changes in the ambulance rates to be charged under section 34.720 of this Code shall be referred by the council to the ambulance committee for its recommendation. (Ord No. 68-70)"

Salem area. The reporter questioned defendant about the committee's disposition toward plaintiff's request. During the interview the defendant made allegedly defamatory statements about the plaintiff which were later published in the newspaper.

Defendant's allegedly defamatory statements referred to plaintiff's business practices as follows:

> "If he wants to have a profitable business, he'll follow the recommendations. But I don't think he wants a profitable business. I don't think he cares. His whole attitude absolutely defies good business judgment. I've tried to counsel him for two years on some business practices and it's like talking to an eight year old."

In regard to the possibility that plaintiff's business might close, defendant said, "He's creating his own problems. I refuse to take any responsibility." Defendant also accused plaintiff of not telling the truth to the committee as follows: "He'll sit there and look you eyeball-to-eyeball and still not tell you the truth."

Plaintiff brought this action for slander. In his answer defendant asserted separately affirmative defenses of absolute and of conditional privilege. The parties have not advanced in brief or argument what they conceive to be the distinction between absolute privilege and conditional or qualified privilege. The textbook authors speak variously: Harper on Torts (4th printing 1940), page 528:

> "Privileged occasions are of two sorts, (1) occasions on which certain defamatory utterances are absolute and unqualifiedly privileged, and (2) occasions which afford but a defeasible immunity to the defamer, that is occasions which are qualifiedly privileged. * * *
>
> "* * * * *
>
> "The difference between absolute and qualified privilege lies in the effect of the motive and purpose of the defamer. The malice or malevolent purpose of the defamer is of no consequence if the occasion is absolutely privileged, but if the privilege is conditional only, proof of actual malice or ill-will makes the defendant liable. * * *" (Footnotes omitted)

Essentially the same text appears in 1 Harper and James, the Law of Torts, § 5.21, page 420. Prosser, The Law of Torts (4th Ed 1971), § 114, page 776 states:

"* * * [The defense of privilege] rests upon the same idea, that conduct which otherwise would be actionable is to escape liability because the defendant is acting in furtherance of some interest of social importance, which is entitled to protection even at the expense of uncompensated harm to the plaintiff's reputation. * * * If it is one of paramount importance, considerations of policy may require that the defendant's immunity for false statements be absolute, without regard to his purpose or motive, or the reasonableness of his conduct. If it has relatively less weight from a social point of view, the immunity may be qualified, and conditioned upon good motives and reasonable behavior. The defendant's belief in the truth of what he says, the purpose for which he says it, and the manner of publication, all of which are immaterial when no question of privilege is involved, may determine the issue when he enters the defense of such a conditional privilege.

"Absolute immunity has been confined to a very few situations where there is an obvious policy in favor of permitting complete freedom of expression, without any inquiry as to the defendant's motives." (Footnotes omitted)

The well known commentator on the law of torts in the British Commonwealth nations, John G. Fleming, says essentially the same thing, Fleming, The Law of Torts (5th Ed 1977), pp 548 et seq:

"In certain situations, the law allows one to speak and write without restraint, even at the expense of another's good name and character. These are called Privileged Occasions. Privilege attaches not to content, but to occasion or form. What a member of Parliament says on the floor of the House is privileged, but repetition of the same words outside is not; * * *.

"Privilege is admitted in title of a variety of individual and social interests which are deemed of sufficient importance to displace the countervailing claim to protection of reputation. The interest may be valued so highly that policy requires the writer or speaker to be completely immune regardless of his motive in giving currency to the defamation. More frequently, however, the interest is of lesser weight in the scale of social values, and prevails over the plaintiff's only if the defendant was using the occasion to further the interest which the law regards as worthy of protection. In such cases, the privilege is not *absolute* but *qualified,* in the sense that it is forfeited by abuse. [Emphasis original]

"Because of its drastic effect in proscribing all opportunity for vindicating a traduced reputation, absolute immunity is but rarely granted, * * *. It should, and with rare exceptions is, matched by a high sense of responsibility in those who are its beneficiaries * * *." (Footnotes omitted)

Plaintiff moved for partial summary judgment on the defense of absolute privilege, and defendant moved for summary judgment on each affirmative defense. The trial court denied plaintiff's motion, denied defendant's motion on the defense of conditional privilege, and allowed defendant's motion for summary judgment on the defense of absolute privilege.

Upon appeal plaintiff asserted that the trial court had erred in holding that defendant's statements were absolutely privileged. Defendant quite understandably did not appeal; however, defendant did not raise by his brief, as he might have, any claim that the trial court erred in denying his motion for summary judgment on the asserted defense of conditional privilege. *See, Wiggins v. Barrett & Associates,* 295 Or 679, 669 P2d 1132 (1983), and *Artman v. Ray,* 263 Or 529, 501 P2d 63, 502 P2d 1376 (1972). In his brief in the Court of Appeals plaintiff argued both that defendant was not entitled to the defense of absolute privilege and that at best a conditional privilege should be accorded defendant's statements.

Upon appeal, both parties cast defendant in the role of legislator. The Court of Appeals ruled that the reasoning the Supreme Court of the United States employed in construing the Speech or Debate Clause of the United States Constitution, U.S. Const, Art I, § 6,[2] *Hutchinson v. Proxmire,* 443 US 111, 99 S Ct 2675, 61 L Ed2d 411 (1979), ought to guide the disposition of this case. *Adamson v. Bonesteele,* 58 Or App 463, 648 P2d 1352 (1982). Part of the holding in *Hutchinson* was that the Speech or Debate Clause of the United States Constitution did not protect legislators' statements made outside Congress in newsletters and press releases.

As indicated by the Court of Appeals, the genesis of the Speech or Debate Clause is the common law privilege

---

[2] The clause of the United States Constitution provides that members of Congress "for any Speech or Debate in either House, * * * shall not be questioned in any other place."

protecting the speech of legislators.[3] The *Hutchinson* court described the interest in communicating information free from inhibition as one of the grounds for the privilege. Then the Court distinguished between the need of the legislature to inform itself and the quite separate function of informing the public of legislative activities. The former was held by the Court to be protected by the Speech or Debate Clause because the informing function as so understood is an essential part of the legislative process. The latter activity was held not to be strictly necessary to the legislative process and, therefore, not to be protected by the clause.

The Court of Appeals held that defendant was not entitled to the defense of absolute privilege and reversed and remanded. We allowed review to consider whether that holding was error.

## Absolute Privilege.

■       As a people we have been concerned historically with the value of a good reputation, a fair name.[4] This concern for preservation of the interest in reputation and fair name is reflected in the common law's long standing recognition of a

---

[3] Dean Prosser states that an absolute privilege was recognized at common law as to defamatory statements made by members of Parliament and state legislatures while in the course of such official business as voting, debate, reports or work in committee, Prosser, Law of Torts (4th Ed) § 114, relying upon *Ex Parte Wason,* [1869] 4 QB 73; *Dillon v. Balfour,* 20 LR Ir 600 (1887); *Coffin v. Coffin,* 4 Mass 1 (1808).

[4] For example, in our cultural literature both the Bible and Shakespeare so indicate.

"A good name is rather to be chosen than great riches." Proverbs 22:1.

"I would to God thou and I knew where a commodity of good names were to be bought." Shakespeare: *I Henry IV* I.ii.

"Good name in man and woman, dear my lord,
Is the immediate jewel of their souls;
Who steals my purse steals trash; 'tis something, nothing;
'Twas mine,' 'tis his, and has been slave to thousands;
But he that filches from me my good name
Robs me of that which not enriches him,
And makes me poor indeed." Shakespeare: *Othello* III, iii.

Dictionary of Quotations, Bergen Evans, Delacorte Press 1968, p. 284.

right to recover damages from that person who invades that interest. The action for such damages was one of the "personal" actions for private wrongs described by Blackstone. *See,* 2 Chitty, Blackstone's Commentaries, p. 87. The importance of this concern for injury to reputation is recognized by its mention in the Oregon Constitution.[5]

Nevertheless, it long ago was understood that the interest in preservation of one's good name may have to give way to other societal interests. As the Court of Appeals recognized, the common law protected a member of Parliament, of Congress or of a state legislature in his speech in the course of debate, legislative reports and in committee by granting him immunity from actions for damages for defamatory remarks made in such speech. That immunity is often described as a matter of "absolute privilege." *See,* 3 Restatement (Second) of Torts, p. 243.

This court acknowledged the existence of that absolute privilege in *Noble v. Ternyik,* 273 Or 39, 539 P2d 658 (1975), and extended it to a member of a port commission for speech made during a commission meeting when the commission was acting in its legislative capacity.[6] That extension of immunity was accorded on the reasoning that the Oregon system of governing through various boards and commissions depends upon the willingness of volunteers to serve, often without compensation, that such service should not be discouraged, that the Oregon Public Meeting Law, ORS 192.620 makes the deliberations of bodies such as the port commission open to the public and that unless immunity were granted port commissioners might well fear to convey information to other commission members.[7]

---

[5]   "* * * every man shall have remedy by due course of law for injury done him in his * * * reputation." Or Const Art I, § 10.

[6] Neither the parties in the briefs nor this court in the decision in *Noble v. Ternyik,* 273 Or 39, 539 P2d 658 (1975), considered whether Article I, section 10, of the Oregon Constitution, quoted, *supra,* n. 5, might constrain the court in creating a new immunity for slanderous speech. Likewise, the parties in this case have not addressed that possible issue.

[7] There is a division of authority as to whether the absolute privilege extends to members of subordinate bodies performing legislative functions. *See* Prosser, Torts (4th ed) § 114 and cases cited.

Defendant argues that this immunity should be extended to his speech to a newspaper reporter outside a meeting of the advisory committee and the council. As noted above, the Court of Appeals agreed with the reasoning of the Supreme Court of the United States in *Hutchinson* that the constitutional embodiment of the immunity should not extend to press releases and newsletters made outside legislative meetings. This is in harmony with the treatment of the matter in the common law as found in the Restatement of Torts, § 590.

Restatement of Torts, § 590, approved by the American Law Institute in May, 1937, stated:

"A member of the Congress of the United States or of the legislature of any State or Territory thereof is absolutely privileged to publish false and defamatory matter of another in the performance of his legislative function."

One sentence in *Comment a* noted that the privilege extended to the work of committees, even during legislative recesses but made clear that the "black letter" did not extend outside the chamber or meeting place:

"The privilege does not protect a legislator who in private or public discussion outside the legislative chamber explains his reasons for voting on past, pending, or proposed legislation or who otherwise discusses such legislation."[8]

As had this court several months earlier in *Noble v. Ternyik, supra,* Restatement (Second) of Torts, § 590, as adopted on May 19, 1976, reflected a change in the common law to extend the absolute privilege to local legislative bodies:

"A member of the Congress of the United States or of a State or local legislative body is absolutely privileged to publish defamatory matter concerning another in the performance of his legislative functions."

There is no explanatory material as to why the last word of the "black letter" rule was changed to the plural. Tentative Draft No. 21, April 5, 1975, *comment c* discusses the extension of the

---

[8] We have attempted to trace the "legislative history" of that sentence of *comment a.* The comment is found in Torts Tentative Draft No. 13, March 2, 1936, and in Torts Proposed Final Draft No. 3, April 9, 1937, but there are no explanatory notes concerning the comment or this sentence thereof. The drafts were considered at the May, 1937, meeting of the American Law Institute, but there was no floor discussion of *comment a.*

rule to local legislators, stating that it was the new majority view. There is no discussion of the sentence with which we are concerned in *comment a* even though the sentence has been changed. That sentence, as now found in Restatement (Second) of Torts, § 590, *comment a,* states:

> "The privilege does not protect a legislator who in private or public discussion outside of his legislative function explains his reasons for voting on past, pending or proposed legislation or who otherwise discusses the legislation, or who engages in other activities incidentally related to legislative affairs but not a part of the legislative process itself."

Neither party to this litigation has referred us to any significance to be attributed to the change in language. Our own research does not discover any.

It would appear most likely that the sentence thus limiting legislative absolute immunity is based upon a decision recognized as leading by all of the textbook authors mentioned above. That is the case of *Coffin v. Coffin,* 4 Mass 1 (1808). "The only important judicial discussion of legislative immunity is the opinion of Chief Justice Parsons in the case of Coffin v. Coffin, in 1908." Van Vechten Veeder, *Absolute Immunity in Defamation: Legislative and Executive Proceedings,* 10 Colum L Rev 131, 135 (1910). In footnote 19 the writer describes that case and the approval of the opinion by the Supreme Court of the United States:

> "In this case it appeared that a member of the Massachusetts House of Representatives obtained leave to lay on the table a resolution authorizing the appointment of an additional notary public for Nantucket. Thereupon the defendant, another member, asked where the proposer obtained his information of the facts stated, and met with the reply that the information came from a gentleman from Nantucket. The resolution was adopted, and the speaker had taken up some other business, when the defendant crossed the chamber to the place where the proposer was standing and asked him who the gentleman in question was. The proposer pointed to the plaintiff, who was sitting outside the bar; whereupon the defendant exclaimed, 'What, that convict!' The proposer asked the defendant what he meant. 'Don't you know the business of the Nantucket Bank?' asked the defendant. 'Yes,' was the reply, 'but he was honorably acquitted.' The defendant then said, 'That did not make him the less guilty.' The House was not then proceeding to a choice of the additional

notary, who was not selected until a subsequent session, and the plaintiff was not a candidate. Moreover, there was no evidence that the resolution laid on the table and passed, or the subject-matter of it, was afterwards called up for consideration. A verdict in favor of the plaintiff was unanimously sustained on the ground that the defendant was not acting at the time in his official capacity. 'This is, perhaps, the most authoritative case in this country on the construction of the provision in regard to freedom of debate in legislative bodies,' said the Supreme Court of the United States in Kilbourn v. Thompson (1880) 103 U.S. 168."

In *Coffin* the defendant legislator was held not entitled to legislative absolute immunity even though his defamatory speech was uttered to another legislator within the physical bounds of the legislative body.

Of course, as we have lately often remarked, the Restatement is not a code or a statutory scheme binding upon this court or the litigants before us. Insofar as we may find the American Law Institute's distillation of the common law to be accurate and persuasive, we may draw upon it for guidance in our decisions. The limiting sentence found in *comment a* is in point and would deny to this defendant absolute immunity for the remarks made in the press interview.

Defendant further contends that he is statutorily required to disseminate his complained of remarks by ORS 192.650, which provides for the keeping of minutes of meetings of a public body and that such minutes must give a true reflection "of the matters discussed at the meeting and the views of the participants." The defendant argues that the requirement of open meetings and the quoted language create a duty of at least the chairman of the committee to speak to the public through the press as he did here. The statutory text does not support that argument, and we are referred to no other source which might flesh out the statute to convince us of the validity of the argument.

Defendant cites to us three appellate decisions of other states in support of his contention that he should be accorded an absolute privilege for his remarks made to the newspaper reporter: *Sheridan v. Crisona,* 14 NY2d 108, 198 NE2d 359 (1964); *Clark v. McGee,* 417 NYS2d 126, 70 App

Div2d 976 (1979); and *Hauser v. Urchisin,* 231 So2d 6 (Fla 1970). We shall discuss them in order.

*Sheridan* involved a claim of absolute privilege by a local government executive officer "in administering public affairs" and also in performing "quasi-legislative" functions. The defendant, in his official capacity, had submitted a report concerning the plaintiff, a member of a panel of appraisers employed by the City of New York. A few weeks later the defendant made a copy of the report available to newspaper reporters. In holding that defendant was entitled to the absolute privilege the court relied upon one of its earlier decisions, in which it had held that a state executive official had such a privilege. Without any discussion as to why it should be so, the court held that the same rule "must certainly apply to a municipal executive." The court went on to note that the defendant had a New York City Charter duty to "make available to the public on demand" a report such as that involved. The court expressly tied its decision to the defendant's position as an executive, not to his "quasi-legislative" role.

Of the seven members of the New York Court of Appeals, four agreed that defendant was not entitled to the benefit of an absolute privilege, but one of those four agreed with the lead opinion that defendant was entitled to a conditional privilege and that since the record disclosed an absence of actual malice on defendant's part, plaintiff could not prevail. The four judges who would not grant an absolute privilege did so on the basis of a review of the history of privilege in the common law and in constitutional law, federal and state, and by implication from state statutes.

*Clark v. McGee, supra,* is a memorandum opinion, relying in part upon *Sheridan v. Crisona, supra,* affording to a chairman of the town board an absolute privilege for speech uttered to the press "acting pursuant to his duties in releasing the information to the public on an issue of legitimate public concern." The court did not identify the source of that duty. The court did state unequivocally "that absolute privilege extends to communications by a public official made in the course of his duties," citing an earlier Court of Appeals case and an Appellate Division case. There was absolutely no

discussion of the limitations of the rule that the Restatement and Dean Prosser have noted.

In *Hauser v. Urchisin, supra,* the defendant city commissioner and the plaintiff city prosecutor engaged in a public quarrel concerning the plaintiff's competence, and defendant's comments to the press were the subject of the action for damages. In holding that the speech was absolutely privileged the Florida Supreme Court noted that the court had previously held in *McNayr v. Kelly,* 184 So2d 428 (Fla 1966), that "words spoken or written by public servants in judicial and legislative activities are protected by absolute privilege." The *Hauser* court then simply asserted:

> "The public interest requires that statements made by officials of all branches of government in connection with their official duties be absolutely privileged. Under our democratic system the stewardship of public officials is daily observed by the public. It is necessary that free and open explanations of their actions be made. Any public servant should expect that those having authority to discharge him will explain their reasons for such dismissal. 'Those who can't stand the heat should stay out of the kitchen.' In the instant case, petitioner did not make a statement on the firing of respondent until after respondent had made a public denunciation of petitioner, which was equally uncomplimentary."

231 So2d at 8. We find it difficult to ascertain exactly upon which of those reasons in the quoted matter the court most relied. The court was apparently unmindful of any limitations of absolute immunity recognized by the common law.

In all fairness, the *Hauser* court thought the earlier decision in *McNayr v. Kelly, supra,* required the result in *Hauser.* In *McNayr* an executive officer, the "County Manager," published the allegedly defamatory matter in a report to the Board of County Commissioners to explain why the defendant had fired the plaintiff as sheriff of the county. The case does not present the availability of privilege for remarks to the press. A fair reading of the opinion will convince the reader that the court was concerned with whether to extend to an executive official the kind of privilege accorded to those in the legislative and judicial branches of government. The court's holding, which must be read in the context of the case presented, stated:

> "In summary, we hold that executive officials of government are absolutely privileged as to defamatory publications made in connection with the performance of the duties and responsibilities of their office to the same extent as such absolute immunity is afforded to members of the legislative and judicial branches of government."

184 So2d at 433. There is little of comfort to defendant legislator in the case at bar to be found in the Florida decisions.

We do not find the cited decisions to support extending absolute immunity to defendant in this case for his remarks to the press outside the legislative forum.

In summary, we conclude that neither the common law nor any statutory law of this state justifies extending a local legislator's immunity to his remarks concerning legislative business made to the press outside the legislative meeting place and outside the legislative process itself.

## Conditional Privilege.

Having agreed with the Court of Appeals that the trial court erred in affording to the defendant an absolute privilege, we could simply affirm the judgment of the Court of Appeals. It will be recalled, however, that the trial court denied the defendant's motion for summary judgment on the separate affirmative defense of conditional privilege. The trial judge indicated that he did so on the basis that there was a material issue of fact as to that defense. As noted above, the defendant did not raise any claim of error for denial of that motion.

On the other hand, the plaintiff did not, upon appeal, assail the implied holding of the trial court that a conditional privilege should be afforded to the occasion of a local legislator's remarks to the press concerning pending legislative business. Indeed, plaintiff all but conceded the point. In his brief in the Court of Appeals he variously stated:

> "* * * [H]is press interview statements were only, at best, conditionally privileged and whether Defendant acted with malice is a question of fact to be determined by a jury."

> "Policy reasons support the imposition of only a qualified, not absolute, privilege to such statements. A qualified privilege sufficiently accommodates the needs of legislative officials to be able to speak freely upon matters within the scope

of their 'official' duties without sacrificing an individual's right to seek a legal remedy, in appropriate cases, for harm done to his reputational interests. * * *"

"A qualified privilege sufficiently accommodates the needs of lesser legislative officials to be able to speak freely on matters within the scope of their duties."

"The logical alternative to expanding absolute privilege is to protect legislative speech by means of a qualified privilege. A qualified privilege reflects a better accommodation of the various interests involved while also delineating the degree of protections to be afforded to legislative speech along historical, recognizable and manageable lines."

Finally, plaintiff pointed to the decision by this court in *Ivie v. Minton,* 75 Or 483, 147 P 395 (1915). There, the complained of speech was made by a city councilman as a witness before a council committee on which he did not serve. In *Noble* this court characterized the occasion presented in *Ivie* as being the speech of a private citizen to a legislative body. In *Ivie* this court held that this was an occasion of qualified privilege. The implication we draw from plaintiff's commending to our attention the decision in *Ivie* is that the occasion of the speech in the case at bar makes the publication "conditionally" privileged as that term is used in Restatement (Second) of Torts, § 598.[9]

Upon the case as here presented to us we do not question the existence of the occasion of qualified or conditional privilege.

Affirmed.

**LINDE, J.,** concurring.

Although I concur in the Court's opinion, I add a couple of caveats. First, it should be noted that the discussion of *Coffin v. Coffin,* 4 Mass 1 (1808), is presented as a possible explanation for a comment in the Restatement of Torts. That decision is not necessarily a correct indication of the legislative privilege in Oregon under circumstances like those in *Coffin.*

---

[9] Some writers and some courts prefer to term the privilege as "qualified," and some term it as "conditional." We take both adjectives as having the same meaning in this area of the law.

Second, it is not obvious that the common law legislative privilege can be limited in the traditional way in a state in which the public may legislate for itself. Originally the privilege was designed for freedom of debate in an elected legislative body, specifically the highest legislative assembly in the jurisdiction. In Oregon, however, the "legislative power of the state . . . is vested in [the] Legislative Assembly" only with the exception of "the initiative and referendum powers reserved to the people." Or Const art IV, § 1(1). *See also* §§ 1(2)(a) and (3)(a). Moreover, these powers "are further reserved to the qualified voters of each municipality and district as to all local, special and municipal legislation of every character in or for their municipality or district." Or Const art IV, § 1(5).

If the object of the common-law privilege is to protect uninhibited legislative discussion and debate, it might therefore be argued that when a statement relates to an item of public business that may be the subject of an initiative or referendum, even a measure not yet initiated or referred, a citizen is absolutely privileged in bringing information or opinion bearing on that subject to the attention of his fellow citizen-legislators, through the press and other media of mass communication or otherwise. But every kind of public business is not potentially a subject for legislation by the people; it must be legislative in character. In this case, the question whether the subject on which defendant was quoted was "legislation" susceptible to initiative or referendum under article IV, section 1(5), has not been argued or considered below, and the Court decides nothing about this possible issue.