United States Court of Appeals,

Fifth Circuit.

No. 92–3013

Summary Calendar.

Susan DUGAS, Plaintiff,

Gary M. Bougere, Plaintiff–Appellee,

v.

The CITY OF HARAHAN, LOUISIANA, et al., Defendants,

Carlo F. Ferrara, Defendant–Appellant.

Nov. 27, 1992.

Appeal from the United States District Court for the Eastern District of Louisiana.

Before HIGGINBOTHAM, SMITH, DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

BACKGROUND

On January 1, 1987, Bougere was sworn into the office of mayor of the City of Harahan in Louisiana. He resigned from office approximately one year later due to a political dispute involving his recall. Bougere and his wife subsequently moved to Florida. On or about January 5, 1989, Bougere applied to the Florida Board of Bar Examiners for admission to the Florida Bar. As a condition of admission, Bougere executed an "Authorization and Release" form, authorizing the Board to investigate Bougere's character and fitness.[1]

In a letter dated January 10, 1989, the Board contacted the City of Harahan, as a past

---

[1]The Authorization and Release form contains the following provision:

> I hereby release and exonerate every medical doctor, school official, and every other person, firm, officer, corporation, association, organization or institution which shall comply in good faith with the authorization and request made herein from any and all liability of every nature and kind growing out of or in anywise pertaining to the furnishing or inspection of such documents, records and other information or the investigation made by said Florida Board of Bar Examiners. The undersigned further waives absolutely any privilege he may have relevant to his good moral character and fitness to perform the responsibilities of an attorney under Section 90.503 Florida Statutes.

employer of Bougere, seeking information concerning Bougere's character and fitness.[2]  At that time, Ferrara was the mayor of Harahan.  The letter was partly composed of a questionnaire which asked the city to check "yes" or "no" boxes in response to relevant questions pertaining to Bougere's character and fitness, contained therein.

In his City Hall office, Ferrara complied with the Board's request and checked the relevant boxes, drafted a letter on City of Harahan stationary discussing his contacts with and opinions of Bougere, and signed the questionnaire as Mayor of the City of Harahan.  On January 19, 1989, Ferrara returned both documents by mail to the Board.  Ferrara further discussed his contacts with and opinions of Bougere on May 24, 1989 when the Board sent an investigator to Louisiana to interview Ferrara.  The Board held an evidentiary hearing on Bougere's application and ultimately approved his admission to the Florida Bar.

Bougere, and his wife Dugas, filed the instant action on January 12, 1990, in the United States District Court for the Eastern District of Louisiana, alleging Ferrara's response to the Board's letter and statements to the investigator were defamatory, resulting in various injuries to Bougere.[3]  The record reflects that Bougere's sole basis for his action is Ferrara's contacts with the Board.  Ferrara unsuccessfully argued to the district court that his communications with the Board were absolutely privileged due to both his status as a mayor and as a participant in the Board's investigation of Bougere's character and fitness.  At the conclusion of a four day trial, the jury returned a verdict in

---

[2]The letter contained the following language:

> The applicant has authorized all sources having information relative to the character and fitness of the applicant to cooperate with the Board by making that information available to the Board and has released and exonerated all sources from any and all liability of every nature and kind pertaining to the furnishing of information to the Board.

> The Board sincerely appreciates your cooperation in completing this form and assures you that the information furnished by you will be revealed to no one not authorized by the Rules of the Supreme Court of Florida Relating to Admissions to the Bar.

[3]Pursuant to *Jagers v. Royal Indemnity Co.,* 276 So.2d 309 (La.1973), the district court determined that Florida's interest in the application of its law to this action was superior to Louisiana's and, consequently, applied Florida law.  Neither party challenges the court's determination on appeal.

favor of Bougere and against Ferrara, awarding $75,000 in actual damages and an additional $25,000 in punitive damages. The district court entered judgment on the verdict.

Ferrara appeals, arguing his communications with the Board were absolutely privileged, that Bougere failed to prove Ferrara's statements were false and made with actual malice, and that Bougere failed to prove that he suffered any damages as a result of the alleged defamatory statements.

A. Privilege Based on Speaker's Status as a Public Official

The Florida Supreme Court has held that defamatory publications by executive officials of government are absolutely privileged if they are made in connection with the performance of their official duties and responsibilities. *McNayr v. Kelly,* 184 So.2d 428, 433 (Fla.1966). The privilege attaches to communications by public officials no matter how false, malicious, or badly motivated the communication may be. *Id.* at 430. The alleged defamer's good faith or regard for the truth, therefore, is irrelevant. *See Barr v. Mateo,* 360 U.S. 564, 575, 79 S.Ct. 1335, 1341, 3 L.Ed.2d 143 (1959); *Id.* The privilege attaches to such communications regardless of whether they were made in connection with a mandatory duty of the speaker or were merely the result of his discretionary acts. *City of Miami v. Wardlow,* 403 So.2d 414 (Fla.1981), citing *Barr,* 360 U.S. at 575, 79 S.Ct. at 1341. Florida courts have extended the privilege to several categories of executive branch employees. *Id.* 403 So.2d at 416–7 (extending to a deputy police commander of the city of Miami); *McNayr,* 184 So.2d 428 (extending to a county manager); *Skoblow v. Ameri–Manage, Inc.,* 483 So.2d 809 (Fla. 3rd. Dist.Ct.App.1986) (extending to employees of a state hospital); *Kribs v. City of Boynton Beach,* 372 So.2d 195 (Fla. 4th Dist.Ct.App.1979) (extending to a city manager); *Densmore v. City of Boca Raton,* 368 So.2d 945 (Fla. 4th Dist.Ct.App.1979) (extending to a city manager); *Johnsen v. Carhart,* 353 So.2d 874 (Fla.3rd.Dist.Ct.App.1977) (extending to an assistant state attorney).

The controlling issue in deciding whether an executive employee is immune from defamation actions is whether the communication was within the scope of the official's duties. *Skoblow,* 483 So.2d at 811. Whether the communication was made within the scope of the official's duties is a question of law for the court to determine. *See Barr,* 360 U.S. 564, 79 S.Ct. 1335. Florida courts give a broad definition to the term "scope of duties" and its synonyms. *Mueller v. Florida Bar,* 390

So.2d 449, 451 (Fla. 4th Dist.Ct.App.1980).

In *Wardlow,* the Florida Supreme Court held that allegedly slanderous statements by a City of Miami police internal security officer (Murphy) to a captain of the City of Key West police department concerning a former Miami police officer (Wardlow) were absolutely privileged. *Wardlow,* 403 So.2d at 416. The Key West police captain called the Miami police department to inquire about the background of Wardlow, who had applied to the Key West police department for employment. *Id.* at 415. In response to the inquiry, Murphy made several statements which Wardlow considered to be slanderous. *Id.* After noting that there was no administrative rule requiring Murphy to explain the circumstances under which Wardlow left his job, the court stated the following:

> [w]hile the communication at issue here was privately made, as distinguished from the situation in *Barr v. Mateo,* we perceive that an important public function was involved. Murphy's job involved attempting to ensure that no unfit persons were allowed to serve as police officers in the City of Miami. An ancillary function, but very important to the public, would be to communicate the results of his department's investigations to inquiring officials from another municipal police department.

*Id.* at 416.

In *Johnsen,* the court held that a state attorney who had prosecuted Johnsen for several crimes involving moral turpitude and subsequently sent an allegedly defamatory letter to the Miami police department, expressing the attorney's reservations about the plaintiff's fitness to serve as a policeman, was absolutely immune from defamation liability because he acted in the interest of the public good. *Johnsen,* 353 So.2d at 875, 877. The court stated the letter "was something done for the public good and for the purpose of benefiting and enhancing the proper prosecution of criminal offenses." *Id.* at 877.

In *Mueller,* the court held that the Florida Bar's staff counsel's dissemination of a press release concerning the plaintiff's disbarment was absolutely privileged. *Mueller,* 390 So.2d at 452. The court stated:

> It was clearly within the scope of the authority of staff counsel to advise not only appellant's clients but also his prospective client's of appellant's disbarment. The latter category consists of the public at large. Thus dissemination of the press release was in the interest of the public good and therefore absolutely privileged.

*Id.*

In *Skoblow,* the court held that allegedly defamatory statements made by several state hospital officials to the Miami Herald newspaper concerning a dentist who had been discharged from the hospital were absolutely privileged. The court stated:

> [i]n the present case, all the defendants alleged to have defamed the plaintiff either had official supervisory responsibilities over the plaintiff or had responsibilities regarding personnel matters or community relations. Since the statements made concerning the plaintiff's discharge were related to and made within the scope of the defendants' official duties, we hold that these defendants are entitled to an absolute privilege and are, therefore, immune from liability for the alleged defamation.

*Id.*

In sum, communications by a public official are made within the scope of his duties if they involve an important public function, further the interest of public good, or if the public official exercised supervisory responsibilities over the alleged victim, or over personnel matters or community relations. In either of these circumstances, Florida law extends an absolute privilege to the communications.

Ferrara's communication with the Board clearly involved an important public function and furthered the interest of public good. The public good involved here is Florida's vital interest in ensuring that only those applicants who are of good character and fitness be admitted to the Bar. When Ferrara, a public official, responded to the Board's efforts to protect this vital interest, his response served the important public function of aiding the Board in its obligation to ensure Bougere's good character and fitness. Although the facts do not reflect Ferrara ever exercised supervisory responsibilities over Bougere, or that his statements involved community relations in Harahan, his mayoral position necessarily bestowed upon him the authority to exercise supervisory responsibility over personnel matters. When the Board requested the City of Harahan to provide information concerning a former mayor, Ferrara clearly had the authority to respond to the letter on behalf of the city. Although Ferrara's response on behalf of the city was not mandated, it was clearly made within the realm of the mayor's discretionary authority. Accordingly, we hold his response is absolutely privileged.

B. Privilege Based on Speaker's Status as a Participant in a State Bar's Investigation of an Applicant

Although no Florida court has directly addressed the issue of whether communications by

individuals to the Board of Bar Examiners concerning the character and fitness of one of its applicants are absolutely privileged, it is clear that the Florida Supreme Court has established the Florida Board of Bar Examiners as an arm of the court to assist the court in exercising exclusive jurisdiction over the admission of persons to the practice of law; that Florida has a compelling state interest in ensuring that only those fit to practice law are admitted to its Bar; and that it is imperative for the protection of the public that applicants to the Bar be thoroughly screened by the Board. *Florida Board of Bar Examiners Re: Applicant,* 443 So.2d 71, 74 (Fla.1983). Moreover, statements by parties who lodge a complaint against a member of the Florida Bar are absolutely privileged. *Stone v. Rosen,* 348 So.2d 387, 389 (Fla. 3rd.Dist.Ct.App.1977).

In the only opinion which we could find directly on point, an Illinois Court extended an absolute privilege to communications by individuals to a state bar committee investigating the character and fitness of a bar applicant. *Kalish v. Illinois Education Association,* 157 Ill.App.3d 969, 110 Ill.Dec. 72, 79, 510 N.E.2d 1103, 1110 (1st Dist.1987). In *Kalish,* the Illinois Education Association (IEA) allegedly responded to the Illinois' Bar Character and Fitness Committee's request for information concerning the character and fitness of Kalish. *Id.* 157 Ill.App.3d 969, 10 Ill.Dec. at 73, 510 N.E.2d at 1104. After Kalish experienced difficulties in his admissions process, he sued the IEA for providing allegedly defamatory information to the Committee. *Id.* 157 Ill.App.3d 969, 10 Ill.Dec. at 74, 510 N.E.2d at 1105. The sole issue on appeal of the dismissal of Kalish's action was whether the Character and Fitness Committee was a quasi-judicial body, thereby entitling the IEA to an absolute privilege for statements made in response to the Committee's inquiry about Kalish's character and fitness. *Id.* The court held that the Committee was a quasi-judicial body, and therefore, the IEA's response was absolutely privileged. *Id.* 157 Ill.App.3d 969, 10 Ill.Dec. at 77, 79, 510 N.E.2d at 1108, 1110.

In reaching this conclusion, the court recognized the vital importance of ensuring the good character of Illinois' Bar applicants and that "important public policy considerations support the granting of an absolute privilege to communication with the Character and Fitness Committee." *Id.* 157 Ill.App.3d 969, 10 Ill.Dec. at 78, 510 N.E.2d at 1109. The court continued as follows:

An applicant for admission to the bar must establish to the satisfaction of the Committee that he possesses the good moral character and general fitness required of an attorney to practice law. Because character and fitness committees lack the personnel and other resources to conduct independent investigations of bar applicants, they are obliged to rely primarily on truthful answers by the applicants to committee questionnaires as a source of material information. An essential source of such information is the applicant's former employers. The Committee's ability to obtain frank and candid evaluations of an applicant's moral character, reputation and fitness for the practice of law would be seriously jeopardized if employers were exposed to retaliatory libel actions be disgruntled applicants. We do not believe that a qualified privilege would provide adequate protection.

... [W]e believe that persons having relevant information should be encouraged to impart it and should be free to speak freely, unfettered by fear of being held to respond in damages.

*Id.* (citations omitted)

As indicated above, it is vitally important for Florida to ensure the good character and fitness of its Bar applicants. To this end, the Florida Supreme Court established the Board as an arm of the court to thoroughly screen Bar applicants. An essential element of the Board's screening process is the solicitation of information from applicant's former employers. The letter which the Board sent requesting information about the applicant expressly represented that the applicant had "released and exonerated" all respondents to such request for information. If these employers were not absolutely immune from defamation liability for statements bearing upon a Bar applicant's character and fitness, they would shrink from the Board's request for such information. In that event, Florida's vitally important interest in ensuring an applicant's character and fitness would be thwarted. Therefore, to preserve this interest, an absolute privilege should be extended to such communications.

Recognizing that Florida extends an absolute privilege to statements by parties who lodge a complaint against a member of the Florida Bar pro vides an analogous rationale for finding such a privilege in this case. In *Stone v. Rosen,* the court rejected the application of a qualified privilege to statements by parties who lodge a complaint against a member of the Florida Bar and held that such statements were absolutely privileged. *Stone,* 348 So.2d at 389. In reaching this conclusion, the Florida court provided the following rationale:

[m]embers of the legal profession are accorded rights and privileges not enjoyed by the public at large; the acceptance of these carries with it certain responsibilities and obligations to the general public. For the sake of maintaining the high standards of the profession and disciplining those who violate the Canons of Legal Ethics, one who elects to enjoy the status and benefits as a member of the legal profession must give up certain rights or causes of action which, in this instance, is the right to file an action against a complainant who lodges

an unsuccessful complaint with the Grievance Committee of the Florida Bar.

*Id.*

Because it would be inconsistent with the rationale in *Stone* to accord a lesser privilege to communications with the Board of Bar Examiners, we hold absolute privilege must be extended. We are comfortable that in so holding we are reaching the same conclusion the Florida Supreme Court would reach if this issue were directly before it.

## CONCLUSION

We reverse the judgment of the district court and render judgment that Appellee take nothing herein.

Costs assessed against Appellee.